STATE OF NEBRASKA, APPELLEE, V.
TERRY A. BARFIELD, APPELLANT.
723 N.W.2d 303

Filed November 3, 2006. No. S-05-973.

Glenn A. Shapiro and Jill A. Daley, of Gallup & Schaefer, for appellant.

Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.

Wright, Connolly, Gerrard, Stephan, McCormack, and Miller-Lerman, JJ., and Hannon, Judge, Retired.

McCormack, J.

## I. NATURE OF CASE

On September 6, 2003, Terrill Williams, the victim, died of a single gunshot wound. He was shot at a location referred to by witnesses as "the projects" in Douglas County, Nebraska, by Clinton Lamar Barfield (Clinton). The defendant, Terry A. Barfield, Clinton's uncle, was charged with felony murder as an aider and abettor of the attempted robbery of the victim. He was also charged with use of a deadly weapon to commit a felony, possession of a deadly weapon by a felon, and being a habitual criminal.

After a trial by jury, the defendant was found guilty of felony murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a felon. After the court's denial of the defendant's motion for new trial, the defendant was sentenced to life imprisonment for the felony murder and, pursuant to the habitual criminal statute, to 25 years' imprisonment for each of the other two counts, all sentences to run consecutively. The defendant timely appealed. The defendant argues that the evidence was insufficient to support his convictions, that the defendant was prejudiced by the trial court's refusal to declare a witness unavailable and allow into evidence her deposition testimony, that the defendant was prejudiced by the trial court's failure to include an instruction to the jury regarding the reliability of jailhouse informants, and that various remarks by the prosecutor

during closing arguments, although not objected to at trial, constituted plain error.

We conclude that the misconduct of the prosecutor during argument to the jury would, if uncorrected, result in damage to the integrity, reputation, and fairness of the judicial process. Accordingly, we find plain error in the prosecutor's conduct and reverse the convictions. We consider the sufficiency of the evidence in order to determine whether double jeopardy bars a new trial. We ultimately conclude that the evidence was sufficient and remand the cause for a new trial.

## II. BACKGROUND

### 1. TRIAL TESTIMONY

#### (a) State Witnesses

The State's theory of the case against the defendant was that Clinton and the defendant were drug dealers in the projects and that they were upset with the victim for taking away some of their business. The victim was not from the projects, but often stayed there with his girl friend, who lived in the apartment where the shooting occurred. Under the "unwritten rules" of the projects, if one was not from the projects, then one needed special permission from someone like the defendant in order to sell drugs to project residents.

Late in the evening of September 5, 2003, Clinton and two friends, Dontavious Valentine and "Dreds," went to confront the victim. According to Clinton's testimony, they had only heard that the victim was dealing in the projects and they went to settle the issue and serve an "eviction notice" if, in fact, the victim was selling drugs. The evidence is unclear as to the defendant's involvement in planning the confrontation of the victim, but it is undisputed that at some point after Clinton, Valentine, and Dreds began their confrontation of the victim at the apartment, the defendant joined them.

Prosecution witness Gayla McSpadden witnessed the confrontation from outside the apartment, while witnesses Michael Rafael Hill (Rafael) and Kevin F. McIntyre were inside the apartment when Valentine knocked on the door and called the victim outside. The confrontation ultimately developed into Clinton's threatening the victim with a gun and demanding a

"pocket check." McSpadden, Valentine, and Clinton testified that Clinton obtained the gun from the defendant, who handed it to Clinton either immediately prior or subsequent to his demands for a "pocket check." According to Valentine, when the defendant handed Clinton the gun, the defendant told Clinton to "handle his business." Rafael did not see the moment when Clinton obtained the gun, but testified that the gun he saw Clinton use to threaten the victim belonged to the defendant. Rafael had seen the gun some days before, when the defendant was talking about how he had bought it to pass out "eviction notices."

According to Clinton, the "pocket check" was to see if the victim had any drugs on him. Clinton claimed he was not trying to rob the victim, but only trying to discover whether the victim was selling drugs. Clinton admitted, however, that if the victim had turned any drugs out of his pockets, then Clinton would have taken the drugs and either "stomp[ed]" them or let "a crackhead lady" smoke it all in front of the victim. McSpadden explained that a "pocket check" meant generally to "[g]ive up" what one had.

Valentine described Clinton as demanding that the victim " '[G]ive it up, or I [will] kill you.' " Rafael testified that Clinton was "robbing" the victim, and he described how the victim told Clinton and the defendant, " 'You all going to have to do what you got to do. I ain't about to give you all my shit.' " The defendant responded to the victim, " 'Fuck that. Come on, get up off of it.' " According to Rafael, as Clinton was demanding the "pocket check," the defendant was telling Clinton to " 'do what you got to do' " and was saying that this was an "eviction notice" and that they were tired of " 'mother fuckers being down in their neighborhood.' "

When the victim refused the "pocket check," Clinton fired the gun into the ground. At that point, McSpadden yelled "one time," which meant that the police were coming. Everyone started to run away, and the victim tried to retreat to the apartment. According to the testimony of Valentine, Clinton, and Rafael, the defendant checked and saw that the police were not really coming and called Clinton and the others back. According to Rafael, the defendant announced, " 'The mother fuckin' police

ain't coming. Come back here and do what you came here to do. Finish the shit off.' "

The victim did not quite get the door of the apartment closed, and there was some dispute among the prosecution witnesses whether the defendant forced the door open, insisted that the occupants not shut the door on him, or merely knocked. It is clear, however, that Clinton entered the apartment and continued the confrontation with the victim. The defendant either entered the apartment or remained nearby in the doorway or on the front stoop.

Clinton again began demanding a "pocket check." The witnesses described that the defendant was encouraging Clinton and again told Clinton to "handle his business." According to Valentine, the defendant was "boosting up [Clinton's] ego because everybody hear Clinton tell [the victim] he don't want to do it to [the victim]." Clinton described that when the victim had "his back up against the wall," saying, " '[m]an, this ain't for us,' " Valentine and the defendant were telling Clinton to " 'forget what he's talking about, man, handle that.' " Clinton testified that he understood the defendant to be telling him that "[i]f you don't come off something, take some type of action," meaning to shoot the victim.

When the victim heard the defendant's remark, the victim grabbed for the pistol, and Clinton described that "it just went off." Other witnesses described a scuffle culminating in Clinton's getting the victim into a headlock and shooting him. The victim stumbled out the front door and fell to the ground. According to Clinton, the defendant took back the gun and they all fled. The evidence from the scene of the crime showed that the victim had approximately $188 in cash, gold chains, and numerous business cards and telephone numbers in his pockets.

### (b) Defense Witnesses

The defense's theory of the case was that the defendant was not there when the shooting of the victim took place or that, if there, the defendant was an innocent bystander to the crime. Defense witnesses Marquita Michelle Johnson and Mark Terry Eugene Harrison Morris (Harrison) testified that on the night in question, they were sitting outside on the front stoop of a

residence a few doors down from the apartment where the shooting occurred. They saw Clinton, Valentine, and Dreds walk toward the apartment and testified that Clinton already had a gun when he walked by. According to Harrison and Johnson, the defendant did not arrive at the apartment until it was "already too late" and the victim had been shot. According to Johnson, when the defendant arrived and saw that the victim was shot, he said, " 'oh, shit, fuck, man.' "

The defense also called Marquita Russell, who was inside the apartment the night the victim was killed. Russell testified that she first saw the defendant when the victim stepped outside after Valentine knocked on the door. The defense pointed out that in statements she had made to the police, Russell said she " 'could have swore [Clinton] pulled [the gun] from his self,' " and did not get it from the defendant. However, at trial, Russell testified that she actually had not seen how Clinton had gotten the gun. Russell testified that she did not hear the defendant say anything to Clinton during his confrontation with the victim.

## 2. CLOSING ARGUMENT

Two themes ran through the State's closing argument. First, the prosecutor described the defendant as a ruler and bully of everyone in the projects. Second, he emphasized the courage of the witnesses who testified against the defendant, stating, "Do you have any idea the courage that it takes to come in here and testify against [the defendant]?"

The State then used vivid imagery to help explain how the defendant played such an important part in not only providing the murder weapon, but in pressuring Clinton to use it. The State described the defendant as a 36-year-old "holding onto the last vestiges of his reign" in the "young man's game" of "[s]linging dope." The State argued: "You see, [the defendant] is the king of the . . . Projects, not a kind and benevolent ruler, but a vicious dictator who rules with intimidation and tyranny like a two-headed hydra." No one was "slinging dope in this hood without the express approval of [the defendant] because [the defendant] decides who can come and go in the projects."

The State argued that the defendant ordered the robbery of the victim "to establish that he's still got it." Had they succeeded

in getting the "booty" from the victim's pockets, there was no doubt that the defendant would have "claimed the prize." The State again described the defendant as "[t]his man, this tower of terror, monster of mayhem, this king of killers . . . ." The State pointed out the enormous "strength of the human spirit" present in those testifying against such a "monster."

In the defendant's closing argument, defense counsel described Clinton as lying and generally described inconsistencies amongst the witnesses as generated by lies. Defense counsel then described how, reflecting upon how everyone was lying, he had gone to a dictionary to look up the word "lie." Defense counsel proceeded to state for the jury the definition of "lie." Counsel then reiterated how perhaps Valentine "had to go with a particular theme to make sure he's not sitting at that table with the other defendants in this case."

Defense counsel argued that the jury should discredit most of the prosecution's witnesses and that the jury should instead focus on the police summations of Russell's and Rafael's statements that they had seen Clinton with the gun before the defendant had arrived.

When the prosecutor began the State's rebuttal argument, the first thing he said to the jury was as follows:

> You know, in 20 years as a prosecutor the hardest thing I think I've had to do is sit there with a straight face when a criminal defense lawyer had to look up the definition of "lie" in a dictionary. Why, I thought that was printed on the back of their business cards.

The State went on to describe that "what we should be looking up is the definition of a white lie." The State examined the inconsistencies in various witness testimony. In the State's argument to the jury, it accused the defense and the defense witnesses of "half-truths and white lies":

> They're trying to make this look like Marquita Russell saved the day for [the defendant]. Give me a break. . . . We got Marquita Russell who never waivered [sic]. We got a police report that is incorrect. Shoot him. He made a mistake. . . .
>
> This body of justice, give me a break. We're going to take that from them? That's going to give you a reasonable

doubt? Then walk him. Walk him, with a gold watch and a parade on the way out the door. Don't be insulted. Do not take smoke and mirrors for evidence, folks. This is incredible what they're trying to get you to believe. Incredible.

The State went on to deny that Valentine was given any deal, and described as "smoke and mirrors" an argument by defense counsel that Clinton could be out on parole within 10 years if he were sentenced to only the minimum of the sentence for his plea.

The jury deliberated and returned a verdict against the defendant of guilty on all counts. The trial court denied the defendant's motion for new trial, and the defendant appeals.

### III. ASSIGNMENTS OF ERROR

The defendant assigns that the trial court erred in (1) accepting the jury's verdict finding the defendant guilty of felony murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a felon; (2) not permitting a witness for the defense to be declared unavailable and her deposition read into the record; (3) failing to include an instruction, pursuant to Neb. Rev. Stat. § 29-1928 (Cum. Supp. 2004), regarding the reliability of the testimony of jailhouse informants; and (4) denying the defendant's motion for new trial.

### IV. STANDARD OF REVIEW

■ Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. See, *State v. Bartholomew*, 258 Neb. 174, 602 N.W.2d 510 (1999); *State v. Kula*, 252 Neb. 471, 562 N.W.2d 717 (1997); *State v. Wilcox*, 239 Neb. 882, 479 N.W.2d 134 (1992).

■ When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Muro*, 269 Neb. 703, 695 N.W.2d 425 (2005).

## V. ANALYSIS

### 1. PROSECUTORIAL MISCONDUCT

We first address the defendant's allegation that prosecutorial misconduct denied him a fair trial. Because the defendant did not object to the challenged comments, we review this issue for plain error. See, *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998) (in order to preserve as ground of appeal opponent's misconduct during closing argument, aggrieved party must have objected to improper remarks no later than at conclusion of argument); *State v. Wilson*, 252 Neb. 637, 564 N.W.2d 241 (1997) (addressing whether prosecutorial misconduct constituted plain error where defendant failed to make timely motion for mistrial thereon). Plain error may be found on appeal when an error, unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. See, *State v. Bartholomew, supra*; *State v. Kula, supra*; *State v. Wilcox, supra*. As described by the U.S. Supreme Court, "the plain-error exception to the contemporaneous-objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.' " *United States v. Young*, 470 U.S. 1, 15, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985).

Generally, in assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper. It is then necessary to determine the extent to which the improper remarks had a prejudicial effect on the defendant's right to a fair trial. See, e.g., *U.S. v. Rivera*, 153 F.3d 809 (7th Cir. 1998); *United States v. Hernandez*, 779 F.2d 456 (8th Cir. 1985); *Judge v. State*, 539 S.W.2d 340 (Tenn. Crim. App. 1976).

We turn now to the specific instances of misconduct asserted here. The defendant complains that the State committed prosecutorial misconduct in (1) its hyperbolic description, by various terms, of the defendant as a monster and (2) its reference to defense attorneys as having the definition of "lie" written on the backs of their business cards. In both respects, we find that the prosecutor's comments were clearly improper. Indeed, the State

does not take issue with the fact that the prosecutor's remarks were improper. Regarding the prosecutor's remark that defense attorneys have "lie" written on the backs of their business cards, the State's attorney during oral argument conceded, "Improper? Yes, absolutely. I can't even pretend to make an argument that it's not." The State asserts only that the misconduct in this case does not demand reversal under the plain error doctrine.

Public prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial. Prosecutors are not to inflame the prejudices or excite the passions of the jury against the accused. See, *State v. Olsan*, 231 Neb. 214, 436 N.W.2d 128 (1989); *State v. Davis*, 185 Neb. 433, 176 N.W.2d 657 (1970); *Pierce v. State*, 173 Neb. 319, 113 N.W.2d 333 (1962); *Garcia v. State*, 159 Neb. 571, 68 N.W.2d 151 (1955). As explained by the U.S. Supreme Court in *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935), a prosecutor

> is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.

Accordingly, "[i]t is as much [a prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id.* Because the "average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed," "improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Id.* As this court has further pointed out, a prosecution solidly based upon the law and the facts and supported by sound reasoning does not require bolstering by appeals to passion and prejudice. *State v. Casados*, 188 Neb. 91, 195 N.W.2d 210 (1972).

As reflected above, in its closing argument, the State referred to the defendant in turn as a "vicious dictator," a "two-headed hydra," a "tower of terror," a "monster of mayhem," and a "king of killers." In *Kellogg v. Skon*, 176 F.3d 447, 451-52 (8th Cir.

1999), the prosecutor similarly referred to the defendant as a " 'monster,' " a " 'sexual deviant,' " and a " 'liar.' " The court concluded that "[n]ot only are these comments an improper 'personal expression of [the] defendant's culpability,' . . . but the 'monster' and 'sexual deviant' comments also create inflammatory prejudice." *Id.* at 451-52. The court stated that such comments had "no place in a courtroom." *Id.* at 452.

In *State v. Casados, supra,* we considered the prosecutor's remarks in closing argument referring to the defendant as a " 'despicable' " person, "the most lowly person the jury would have occasion to judge," and "a pimp." *Id.* at 96, 195 N.W.2d at 214. We noted that the trial judge, in response to these remarks, did not issue a severe rebuke, but merely directed the jury to disregard any statements not supported by the evidence. We further observed that the evidence presented against the defendant was not overwhelming. We concluded that under the particular circumstances presented, the inflammatory remarks which focused on other crimes and not the offense with which the defendant was charged, were sufficiently prejudicial to warrant reversal of the defendant's conviction. See *id.*

We explained that the prosecutor's argument clearly violated one or more of the subparagraphs of Standard 3-5.8, currently found at the American Bar Association Standards for Criminal Justice Prosecution Function, and Defense Function (3d ed. 1993). Part III of the Standards, and especially Standards 3-5.1 to 3-5.10 inclusive, are "appropriate and proper standards and should be complied with by prosecutors in the trial of criminal cases." See *State v. Casados,* 188 Neb. at 97-98, 195 N.W.2d at 214-15. Subparagraph (c) of Standard 3-5.8 provides that during argument to the jury, "[t]he prosecutor should not make arguments calculated to appeal to the prejudices of the jury." Similarly, subparagraph (d) states: "The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence."

Regarding the extent to which this type of inappropriate comment is generally considered to have denied a defendant a fair trial, we recognize that "[h]yperbole in closing arguments is hardly rare, and juries should be given credit for the ability to filter out oratorical flourishes." *Com. v. Griffith,* 45 Mass. App.

784, 787, 702 N.E.2d 17, 19 (1998). See, also, *State v. Casados, supra*. We need not delve, however, into whether the hyperbolic comments against the defendant in this case, considered alone, would warrant reversal under the plain error standard. As the defendant points out, the prosecutor did not stop there.

During rebuttal, the prosecutor's first statement to the jury was as follows:

> You know, in 20 years as a prosecutor the hardest thing I think I've had to do is sit there with a straight face when a criminal defense lawyer had to look up the definition of "lie" in a dictionary. Why, I thought that was printed on the back of their business cards.

In essence, the prosecutor insinuated that defense lawyers are all liars. This is gravely improper. As described by the court in *U.S. v. Linn*, 31 F.3d 987, 993 (10th Cir. 1994):

> [C]omments by prosecutors to the effect that a defense attorney's job is to mislead the jury in order to garner an acquittal for his client is not only distasteful but borders on being unethical. . . . Such comments only serve to denigrate the legal profession in the eyes of the jury and, consequently, the public at large.

See, also, Canon 7, EC 7-37, of the Code of Professional Responsibility (lawyer should not make unfair or derogatory personal reference to opposing counsel).

In *State v. Wade*, 7 Neb. App. 169, 581 N.W.2d 906 (1998), the Nebraska Court of Appeals reversed the defendant's conviction and remanded for a new trial because the prosecutor suggested to the jury during closing argument that defense counsel was able to obtain acquittals for guilty defendants. The court explained that such a statement "strikes against the underpinnings of our system of criminal jurisprudence" wherein prosecuting attorneys have a duty to conduct trials in a fair and impartial manner. *Id.* at 180, 581 N.W.2d at 914.

In *State v. Lockhart*, 24 Kan. App. 2d 488, 947 P.2d 461 (1997), the court found that the prosecutor's comments during closing arguments referring to the defendant and defense counsel as "liars" denied the defendant a fair trial, and the court reversed the conviction. The court explained that "[j]uries must be given an opportunity to exercise reason and sound judgment in

deciding the facts of a case, free from passion and prejudice." *Id.* at 492, 947 P.2d at 465. "Trials cannot be allowed to degenerate into name-calling contests." *Id.*

The court in *State v. Pham*, 27 Kan. App. 2d 996, 1001, 10 P.3d 780, 785 (2000), reversed the defendant's conviction after considering the prosecutor's remarks during closing argument that defense counsel's " 'job is to defend his client. They don't care about the truth.' " Although defense counsel had failed to object as to the inflammatory nature of the remarks, on appeal, the court found the remarks constituted plain error. The court explained that, in essence, the prosecutor had called defense counsel a liar. The court further explained that the prosecutor's comments "reflect an ill will toward the defendant and opposing counsel that is destructive to the professionalism on which the bar prides itself." *Id.* at 1005, 10 P.3d at 787. The remarks "constituted gross and flagrant misconduct that denied the defendant a fair trial." *Id.* at 1005, 10 P.3d at 787-88. The prosecutor had simply "crossed the line." *Id.* at 1006, 10 P.3d at 788.

Considering the cumulative effect and the egregious nature of the prosecutor's comments presented here, we similarly conclude that to leave such conduct uncorrected would result in damage to the integrity, reputation, and fairness of the judicial process. We again emphasize that the remarks made by the prosecutor, especially the prosecutor's statement to the effect that defense lawyers are liars, are of a very serious nature. In addition, the prosecutor's unacceptable remarks do not reflect a single, isolated instance, but were numerous. Moreover, because the disparaging remark as to defense attorneys was made during rebuttal, defense counsel had no opportunity to respond to and mitigate the last impression left with the jury before deliberations: that defense counsel, like all defense lawyers, was a liar.

In an analogous case, the court in *U.S. v. Rodrigues*, 159 F.3d 439 (9th Cir. 1998), reversed the conviction on certain counts against the defendant where the prosecutor told the jury in closing that defense counsel was trying to deceive them as to what proof was required to convict the defendant on those counts. Although the jury was instructed as to the proper elements of proof on the counts, the court still could not dismiss as harmless the prosecutor's improper remarks when immediately after

the prosecutor's closing, the jury went home for the night and defense counsel did not object or move for a mistrial until the following morning. The court explained:

> The last thing the jurors heard as they went home for the night and thought about the case they would have to decide the next day was that the representative of the United States held defense counsel to be a liar who from the beginning of the case had set out to mislead them. The representative of the United States does not speak as a mere partisan. He speaks on behalf of a government interested in doing justice. When he says the defendant's counsel is responsible for lying and deceiving, his accusations cannot fail to leave an imprint on the jurors' minds. And when no rebuke of such false accusations is made by the court, when no response is allowed the vilified lawyer, when no curative instruction is given, the jurors must necessarily think that the false accusations had a basis in fact. The trial process is distorted.

*Id.* at 451.

While it could be argued here that defense counsel invited the rebuttal remark by calling the State's witnesses liars, we draw a distinction between overzealous attacks on witness credibility and what amounts to an attack on the personal integrity of defense counsel. See *State v. Smith*, 14 Ohio St. 3d 13, 470 N.E.2d 883 (1984) (frustration of prosecutor does not justify improper comments, especially where defense did not make similar personal attacks). Finally, we note that although, as determined below, the evidence was sufficient to support the judgment, it cannot be said that the evidence was overwhelming against the defendant. Conflicting evidence was presented as to whether there had been an attempted robbery and as to the extent of the defendant's involvement. The credibility of the witnesses was a key factor, and the implication that defense counsel was a liar, and by extension was willing to suborn perjury, was highly prejudicial when viewed in that context.

Considering the context of the prosecutor's remarks and the trial as a whole, we find this to be a rare instance in which unobjected-to prosecutorial misconduct constitutes plain error demanding a retrial.

## 2. SUFFICIENCY OF EVIDENCE

We next address the defendant's assertion that the evidence was insufficient to support a conviction on any of the counts charged. Upon finding error in a criminal trial, the reviewing court must determine whether the evidence offered by the State and admitted by the trial court, whether erroneously or not, would have been sufficient to sustain the conviction before the cause is remanded for a new trial. *State v. Beeder*, 270 Neb. 799, 707 N.W.2d 790 (2006). Although the Double Jeopardy Clauses of the federal and state Constitutions do not protect against a second prosecution for the same offense where a conviction is reversed for trial error, they bar retrial if the reversal is necessitated because the evidence was legally insufficient to sustain the conviction. *Id.*; *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003).

When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Muro*, 269 Neb. 703, 695 N.W.2d 425 (2005). An appellate court will not set aside a finding of guilty in a criminal case where the finding is supported by relevant evidence, and only where the evidence lacks sufficient probative force as a matter of law may the appellate court set aside a finding of guilty as unsupported by the evidence beyond a reasonable doubt. *State v. Walton*, 246 Neb. 893, 523 N.W.2d 699 (1994).

The defendant first argues that the evidence was insufficient on the felony murder and use of a deadly weapon charges because the prosecution failed to prove (1) that the defendant encouraged or intentionally helped Clinton commit the crime of attempted robbery, (2) that the defendant knew Clinton intended to commit the crime of attempted robbery or expected Clinton to commit the crime of attempted robbery, or (3) that the crime of attempted robbery was ever committed by Clinton. In essence, the defendant asserts that there was insufficient proof of the underlying felony of attempted robbery and that even if an attempted robbery occurred, the defendant was not an aider

and abettor of that crime. The evidence is undisputed that if a crime of attempted robbery occurred, it was carried out with a deadly weapon. But if there was not attempted robbery, then the use of a deadly weapon charge fails as well.

### (a) Evidence of Robbery

We find that the evidence was sufficient to prove that Clinton committed the crime of attempted robbery. Under Neb. Rev. Stat. § 28-324 (Reissue 1995), a person commits robbery if, with the intent to steal, he or she forcibly and by violence, or by putting in fear, takes from the person of another any money or personal property of any value whatever. Pursuant to Neb. Rev. Stat. § 28-201(1) (Cum. Supp. 2004), a person is guilty of an attempt to commit a crime if he or she:

(a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as he or she believes them to be; or

(b) Intentionally engages in conduct which, under the circumstances as he or she believes them to be, constitutes a substantial step in a course of conduct intended to culminate in his or her commission of the crime.

(2) When causing a particular result is an element of the crime, a person shall be guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, he or she intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

(3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

In this case, testimony by McSpadden, Valentine, Rafael, Clinton, and even defense witness Harrison, described Clinton's attempts, while threatening the victim with a gun, to take from him whatever he had in his pockets. Clinton, although stating that he demanded a "pocket check" only to ascertain whether the victim was selling drugs, admitted that had the victim complied with that demand and handed over drugs from his pockets, Clinton would have taken the drugs.

 Clinton testified that after taking the drugs from the victim, he would not have kept them, but would have destroyed them in the victim's presence or had someone consume them in front of the victim to teach the victim a lesson. Even if Clinton's testimony as to his intentions is to be believed, that evidence would be sufficient to support a conviction on attempted robbery. Section 28-324 requires an intent to "steal" for there to be the commission of the crime of robbery. To "steal" is not specifically defined by the statute. The expression has been commonly described as a "taking without right or leave with intent to keep wrongfully." *State v. Aldaco*, 271 Neb. 160, 170, 710 N.W.2d 101, 110 (2006). Accord *State v. Blotzer*, 188 Neb. 143, 195 N.W.2d 199 (1972). The defendant seems to infer that in order to "steal," the object must be taken *for oneself*. However, the focus of the statute is on the intent to deprive the owner of his or her property permanently, to keep it *from* him or her.

 The victim has his or her property stolen regardless of whether the thief thereafter uses it for selfish gain, destroys it, abandons it, or gifts it to another. See, e.g., *State v. Roberts*, 110 Ohio St. 3d 71, 850 N.E.2d 1168 (2006) (rejecting claim that taking of car from victim to escape and then abandoning it was not theft). To "steal" is to "take (another person's property) without permission or legal right and without intending to return it." Concise Oxford American Dictionary 887 (2006). The evidence viewed in a light most favorable to the State shows that, for whatever purpose, Clinton intended, through force and intimidation, to take the victim's personal property from him.

### (b) Evidence of Aiding and Abetting Felony Murder

 We also find the evidence sufficient to sustain the jury's finding that the defendant was an aider and abettor to Clinton's attempted robbery. The aiding and abetting statute, Neb. Rev. Stat. § 28-206 (Reissue 1995), provides that "[a] person who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he were the principal offender." Aiding and abetting requires some participation in a criminal act and must be evidenced by some word, act, or deed. No particular acts are necessary, nor is it necessary that the defendant take physical part in the commission of the crime or

that there was an express agreement to commit the crime. Mere encouragement or assistance is sufficient. *State v. McPherson,* 266 Neb. 715, 668 N.W.2d 488 (2003). When a crime requires the existence of a particular intent, an alleged aider or abettor can be held criminally liable as a principal if the aider or abettor knew that the perpetrator of the act possessed the required intent or that the aider or abettor himself or herself possessed the required intent. *State v. Leonor,* 263 Neb. 86, 638 N.W.2d 798 (2002).

McSpadden's testimony indicated that the defendant was present and heard Clinton demanding a "pocket check," which she described as telling the victim to give him everything in his pockets. Then, when Clinton was unsuccessful in his attempts to get the victim to "give up" what he had, the defendant handed Clinton the gun. Valentine and Clinton, in contrast, indicated that the demands for a "pocket check" did not start until after the defendant handed Clinton a gun, but they also described that the defendant remained there after giving Clinton the gun and verbally encouraged Clinton to carry through with the "pocket check."

After Clinton fired the first shot in furtherance of the robbery and they had dispersed for fear of the arrival of the police, Valentine, Clinton, and Rafael all testified that it was the defendant who called them back. To varying degrees, McSpadden, Valentine, Clinton, Rafael, McIntyre, and even defense witness Russell, testified that the defendant assisted Clinton's entry into the apartment in Clinton's continued pursuit of the victim. As the victim refused to give in to Clinton's demands, Valentine, Clinton, and Rafael's testimony was that the defendant encouraged Clinton not to back down. Instead, the defendant told Clinton to "take care of his business."

As described by Rafael, the victim himself recognized that the defendant was a participant in the attempted robbery when he directed his refusals to "give you all my shit" to both the defendant and to Clinton. Only the testimony of Harrison and Johnson described the defendant as arriving innocently at the scene after the attempted robbery and the shooting had occurred.

■ The defendant does not, in fact, deny the evidence discussed above. Instead, his real argument seems to be that the evidence was insufficient because any testimony supporting felony

murder in this case was from biased witnesses, while the testimony contrary to a finding of felony murder was from allegedly disinterested witnesses. This argument has no merit. In reviewing a criminal conviction, it is not the province of an appellate court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or reweigh the evidence. *State v. Gales*, 269 Neb. 443, 694 N.W.2d 124 (2005). The jury's decision to credit the State's witnesses will not be revisited by this court.

The defendant also argues that the evidence was insufficient on these counts because the State failed to prove beyond a reasonable doubt that the defendant's conduct proximately caused the commission of the attempted robbery and the victim's death. The defendant explains that taking the evidence in the light most favorable to the State, "one might argue that there was evidence presented that the jury tended to believe that indicated that [the defendant] handed a firearm to Clinton." Brief for appellant at 34. However, the defendant asserts that there was an efficient intervening cause. The defendant explains that after the defendant allegedly handed Clinton the firearm, Clinton shot at the ground, there was more posturing, the parties dispersed, and then regrouped at which point a struggle occurred and Clinton shot the victim. This, he asserts, precludes proximate cause.

Insofar as defendant can be construed as arguing that an aider and abettor must proximately cause the underlying crime in order to be found guilty, such argument is in error. An aider and abettor is accountable for that which is proximately caused by the principal's conduct regardless of whether the crime would have occurred without the aider and abettor's participation. Generally, the element of proximate cause is met by the perpetrator's act, not by the actions of the aider and abettor. See, § 28-206; *State v. Contreras*, 268 Neb. 797, 688 N.W.2d 580 (2004); *State v. McPherson*, 266 Neb. 715, 668 N.W.2d 488 (2003); *State v. Quintana*, 261 Neb. 38, 621 N.W.2d 121 (2001). Here, there is no dispute that the victim's death was proximately caused by Clinton's shooting the victim. The evidence is sufficient to show that this shooting flowed from the course of an attempted robbery and that the defendant was an

aider and abettor to that crime. There is no deficiency of proof as to the element of proximate cause.

Inasmuch as the defendant's argument can be construed as asserting that the crime of attempted robbery which the defendant aided and abetted had somehow ceased before the fatal shooting, and thus the shooting flowed from a new and separate attempted robbery in which the defendant did not participate, it is contrary to the facts presented at trial. As outlined above, the defendant, during the alleged intervening cause of dispersing and regrouping, as well as the events that took place thereafter, continued to aid and abet the crimes that Clinton committed.

### (c) Evidence of Possession of Deadly Weapon

Finally, we consider the defendant's assertion that there was insufficient evidence to support a conviction of being a felon in possession of a firearm. The defendant's assertion is that the evidence at trial was sufficient, if at all, only to show that the defendant was in possession of a firearm some days prior to the date of possession for which he was charged.

Because there was sufficient evidence that the defendant was in possession of a firearm on September 6, 2003, we need not determine whether, considered alone, the evidence of the defendant's possession of a firearm 2 to 3 days prior to the shooting would be sufficient under an indictment charging him with possession "on or about" that date. McSpadden, Valentine, and Clinton all testified that they saw the defendant give Clinton the gun on the night of the shooting. Other witnesses' testimony that a few days before the shooting, the defendant was in possession of the gun, lends support to the testimony of McSpadden, Valentine, and Clinton. Again, we do not pass on the credibility of the testimony. The evidence was clearly sufficient to support the jury's verdict that the defendant was guilty of being in possession of a deadly weapon on or about September 6.

In conclusion, we find the evidence, viewed in a light most favorable to the State, to be sufficient to support the jury's finding on each count upon which the defendant was convicted. Having reversed the defendant's convictions and remanded the cause for a new trial on the basis of prosecutorial misconduct, we need not address the defendant's remaining assignments of error.

## VI. CONCLUSION

For the reasons stated above, we reverse the defendant's convictions and remand the cause for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.

HEAVICAN, C.J., not participating.