IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE V. EWINGER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

KYLE T. EWINGER, APPELLANT.

Filed October 22, 2019.    No. A-18-470.

Appeal from the District Court for Douglas County: SHELLY R. STRATMAN, Judge. Affirmed.

Joseph L. Howard, of Dornan, Troia, Howard, Breitkreutz & Conway, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

RIEDMANN, ARTERBURN, and WELCH, Judges.

WELCH, Judge.

### I. INTRODUCTION

Kyle T. Ewinger appeals his conviction of first degree sexual assault on a child and the sentence imposed thereon. Ewinger alleges numerous assignments of error. Having considered each of his assignments of error, Ewinger's conviction and sentence are affirmed.

### II. STATEMENT OF FACTS

In 2011, the victim, who was 8 years old, and his mother lived in Omaha, Nebraska. Late that year, the victim's mother and Ewinger met online. Ewinger, who was a school teacher and coached various sports, lived in Sioux City, Iowa. They had their first date in January 2012. According to the victim's mother, a close relationship quickly formed between her, Ewinger, and

the victim. As Ewinger became more involved in the victim's life, he began to watch the victim overnights while the victim's mother worked overnight shifts as a nurse at a hospital.

Ewinger and the victim's mother's relationship continued to progress quickly and they became engaged in April 2012. During that summer, the victim went to Sioux City to stay with Ewinger while the victim's mother was working long hours and overtime at the hospital. The victim later alleged that, during this time period, Ewinger began to sexually assault him. The victim said that Ewinger made him have oral sex, that Ewinger would ejaculate into the victim's mouth, and that Ewinger would have the victim shower with him. The victim stated that sometimes Ewinger used a clear lubricant that came in a bottle. The victim did not tell anyone because he was scared of Ewinger.

In late July 2012, Ewinger moved in with the victim and his mother in Omaha. Ewinger took a job teaching at an elementary school in Iowa and the victim's mother continued working overnight shifts as a nurse at a hospital. In October, Ewinger and the victim's mother were married. According to the victim, Ewinger continued to sexually assault him in the same manner as in Sioux City except that Ewinger no longer showered with him and Ewinger began anally penetrating him. These sexual assaults always occurred at night when the victim's mother was at work. Ewinger threatened the victim not to tell anyone about the assaults, saying that no one would believe him and that "something could happen." The victim stated that he believed Ewinger's threats so the victim did not tell anyone and he continued acting normal.

The victim, his mother, and Ewinger continued living in Omaha until July 2013 when they moved to Sibley, Iowa, after Ewinger accepted a job teaching at a middle school and coaching high school sports. According to the victim, the sexual assaults stopped once they moved to Sibley, which coincided with the victim's mother no longer working overnight shifts. Also occurring upon the move to Sibley was the shift in sleeping arrangements between Ewinger and the victim's mother. Once the parties purchased their home in Sibley in October, Ewinger always slept in the basement on a sectional couch due to their deteriorating relationship.

A few years after moving to Sibley, in the summer of 2015, the family met C.A. at the local swimming pool. C.A. was about 2 years younger than the victim and had a difficult home life. The victim's mother and Ewinger took an interest in C.A., getting him involved in the youth football program, helping him with transportation to practices and games, and feeding him dinner and snacks. Then, when school started in the fall of 2015, C.A. was a student in Ewinger's social studies class. C.A. also started staying overnight at Ewinger's house sleeping in the basement with Ewinger on the sectional couch. Although the victim's mother tried to speak with Ewinger about the inappropriate nature of the sleeping arrangements, Ewinger refused to discuss the issue.

Sometime in late September or early October 2015, the victim's mother saw homosexual pornography on Ewinger's cell phone that involved "[m]en made to look younger with men who appeared to be older." The victim's mother confronted Ewinger who did not deny looking at the pornography, but answered that she did not "understand how hard it was for a man to have a problem with erectile dysfunction, and that he was just trying to find anything that would work to be able to give him an erection." The victim's mother installed a monitoring application on Ewinger's cell phone that allowed her to see Ewinger's web history and text messages on her cell phone. After installing this app, the victim's mother was able to see that Ewinger searched for websites using search terms such as "free man and boy sex stories," "gay sex," "game of

fornication," and "boy and man sex stories." After discovering these searches, the victim's mother again confronted Ewinger and asked him if he had ever done anything to the victim, which Ewinger denied. At that point, the victim's mother informed Ewinger that the searches were not going to help their marriage and she wanted him to leave. This happened on a Monday night; Ewinger did not leave that night, but he did not come home from work the following day. On Wednesday, Ewinger stopped by the house to talk with the victim's mother, who removed the monitoring application from his cell phone at Ewinger's request, and Ewinger told her that he was staying at the school. According to C.A., that Friday night, Ewinger attempted to drop C.A. off at C.A.'s mother's and grandmother's homes but nobody answered at either residence. Ewinger took C.A. back to the school with him. Ewinger had an air mattress to sleep on in his classroom and the two slept on that air mattress together. C.A. alleged that during the night, Ewinger touched C.A.'s "privates," moving his hand "up and down" and that Ewinger told C.A. not to tell anyone or C.A. would get in trouble.

At around 6 a.m. the following morning, the school superintendent, Wilbur Boer, went to the school because he had heard that Ewinger had been sleeping there. After looking in a few different places in the school, Boer went to Ewinger's classroom. Using his master key, Boer unlocked the classroom door, flipped on the lights, and saw a shirtless Ewinger and C.A. laying on an air mattress with a "red blanket overtop." Boer immediately shut the light off, closed the door, and left to speak with a school board member. Later that day, Boer went back to Ewinger's classroom and did a quick search, then returned the following day and searched Ewinger's desk, where he found a bottle of Viagra and a container of Equate personal lubricant. Following this incident, there was a "level one investigation" by the school authorities which included an interview of C.A. who said that nothing inappropriate had occurred. In mid-October, 2015, a public school board meeting was held, after which Ewinger was fired "for sleeping at the school with a student."

At some point that fall, Ewinger resumed staying at the home with the victim and the victim's mother. However, in January 2016, the victim called the police after an altercation between Ewinger and the victim's mother. That altercation effectively ended the relationship between Ewinger and the victim's mother; however, there still was communication between the two parties after that time.

In April 2016, C.A. told his mother that Ewinger had sexually assaulted him that night at the school in October 2015.

In May 2016, the victim tearfully disclosed to his mother that Ewinger had previously sexually assaulted him. This disclosure led the victim's mother to contact law enforcement who set up a forensic interview for the victim at Project Harmony. Thereafter, Ewinger was arrested and charged with first degree sexual assault of a child, a Class IB felony, with the date of the offense charged from July 1, 2012 through July 31, 2013. See Neb. Rev. Stat. § 28-319.01 (Reissue 2016).

### 1. PRETRIAL MOTIONS

Prior to trial, the State filed a motion notifying Ewinger that it intended to offer prior bad acts evidence pursuant to Neb. Evid. R. 404(2), Neb. Rev. Stat § 27-404(2) (Reissue 2016), and Neb. Evid. R. 414, Neb. Rev. Stat. § 27-414 (Reissue 2016), regarding an alleged sexual assault

by Ewinger of a different minor child, C.A., in October 2015. The parties agreed that the depositions of the victim, the victim's mother, and C.A. would be used as evidence on the State's motion in lieu of live testimony. The district court granted the State's motion pursuant to rule 414 ruling that C.A. would be allowed to testify at trial but also noted that the court's ruling was "subject to change after evidence has been presented at trial." The court noted that, although the State's motion included rule 404(2), neither party presented any argument or caselaw on that statute; therefore, the court did not analyze the admissibility of the prior bad acts evidence pursuant to rule 404(2). Additionally, the court's order stated that "[i]n the present case, the State has stated that they intend to offer the evidence under Rule 414. If the State intends to offer the evidence under both rule 414 and 404 at trial, then Nebraska caselaw shows the higher standard must be used."

## 2. JURY SELECTION

During jury selection, a prospective juror made certain comments in response to the State's inquiries regarding the effect of the presumption of innocence that Ewinger contends contaminated the jury pool. The entire exchange between the prospective juror and the State is set forth later in the opinion. In summary, the prospective juror stated that, based upon her training and "skill set" as a TSA employee, she can tell when "something's not right," and her initial assessment was that Ewinger was "[p]robably guilty." The prosecutor continued to question the prospective juror who, in response to the prosecutor's questions, agreed that she could withhold judgment, weigh the evidence, and assess witness credibility throughout the entire trial. After this exchange, the prosecutor asked other prospective jurors whether they had any issues with the presumption of innocence or with the fact that, right then, if asked, they would have to vote not guilty because no evidence had been adduced. A few other prospective jurors expressed an issue with the presumption of innocence and none of the reasons were due to the prospective juror's comments. Both the State and Ewinger passed the jury for cause. The prospective juror did not serve as either a juror or alternate juror.

## 3. TRIAL

Evidence was presented in this jury trial over 4 days in January 2018. The State adduced evidence from numerous witnesses including the victim; the victim's mother; C.A.; Boer; April Anderson, the forensic interviewer from Project Harmony; and Sarah Cleaver, a pediatric nurse practitioner at Project Harmony Child Advocacy Center. Ewinger also called numerous witnesses to testify including several of his family members and other individuals with whom he had coached sports and had seen his interactions with the victim. The evidence adduced also included numerous exhibits.

The victim and C.A. testified to the facts as previously set forth.

### (a) Victim's Mother

In addition to facts as previously set forth, the victim's mother testified that throughout her entire relationship with Ewinger, she never saw him naked, never saw him with an erection, and they never had sex. The victim's mother also acknowledged that in the beginning of their relationship, Ewinger told her that he had erectile dysfunction. She further testified that during

their relationship, Ewinger told her that he had tried Viagra and Levitra but they did not work, but she never actually saw him take either of those medications.

(b) April Anderson

Anderson testified that as a forensic interviewer, she was specially trained in child development and as a mental health provider. She was also trained in how to examine children when there have been allegations or concerns of physical or sexual abuse or that the child has witnessed a crime. Anderson testified that she interviews children without asking leading questions. She stated that she wanted children "to be able to talk about their experiences in their own words, so [she asks] a lot of open-ended questions." Anderson testified that "[m]ost children that have been sexually abused do not disclose right away, so the majority of kids that have been sexually abused delay in their telling . . . and that's for various reasons." She stated:

> Some of the reasons could be that they love the person that may have been abusing them. Oftentimes, it is a family member or close friend that's done something to them, so they don't want to get that person in trouble. Oftentimes, kids think that it's their fault, so there's a lot of self-blame that goes into it. There's also shame, embarrassment, guilt, feeling that it's their fault.
>
> Sometimes older kids understand consequences more, so they may know that this may break up the family. They may know that this person may go to jail because it's wrong. Younger kids, they may not know it's wrong, so that may be another reason for not telling.
>
> . . . [O]ne of the other reasons . . . is that a lot of time kids think they're going to be in trouble, so that is often a reason why kids don't tell as well.

Additionally, Anderson testified that statements from the perpetrator to the victim can affect the time of the victim's disclosure and whether the victim ever makes a disclosure. For example, some perpetrators threaten the victim, such as telling the victim that they will get in trouble which may cause the victim to delay disclosure. Likewise, if the perpetrator states that they will hurt the victim, a parent, loved one, or a pet, the victim often believes that threat. Anderson stated that victims will often believe a perpetrator's threat to take something away from the victim or punish them if the victim makes a disclosure and these types of threats may deter a child from making a disclosure right away. Additionally, Anderson acknowledged that a victim's delay in disclosure is

> different for all kids and all different ages. Oftentimes, it has to do with how close they are to a person that did something to them. The closer they are, the longer their delay may be. So it could -- a delay could only be a few days, or a week, or it could be a month, a year, and it could even be into adulthood.
>
> . . . .
>
> . . . [I]f the perpetrator is someone who is in the home, or is someone who is a parental figure, that is going to affect the child telling right away. And usually . . . there would be a delay. So the child may feel unsafe to tell if that person is living in the home with them. So, oftentimes, the disclosure may not come out until that person's no longer around or in their life anymore.

Anderson also testified that "[o]ftentimes, the child loves the person that is abusing them, they just don't like being abused. So they may have a relationship with them still. They may still like them, do things with them. To everybody else the relationship may still look perfectly normal."

According to Anderson:

[S]exual abuse is usually a traumatic event for a child. The amount of trauma . . . a child has varies from child to child. To each child it's different. But it generally is something that can affect the way they remember things.

So they may remember more about it because it was a relevant or traumatic event, or sometimes they may remember less because their body, their brain, doesn't want to -- it's trying to protect them, so they may not remember every single detail. And it also depends on if it was a one-time event, or if it was something that happened numerous times.

. . . .

Oftentimes, if kids have been abused multiple times, they'll remember what happened to them but they may not be able to differentiate each time from each other. So some of their memories are going to kind of blend together.

They . . . won't be able to tell what happened from beginning to end for each specific incident. They may -- it kind of has to do with script memory versus -- just forgot the word I was going to use. But being able to talk about it in general. Being able to say what usually happens. So that it does affect all the details. They may not remember every single detail.

Anderson testified that "script memory" is when a victim describes what "usually happens" and they are able to give a general sense of the incident. "Episodic memory" is when the victim is able to talk about specific incidents and provide specific details going from beginning, middle, to end.

Anderson testified that the victim in this case was 12 years old at the time of his interview. Anderson described the victim as "[c]ooperative. He was a little bit shy and reserved. Not really wanting to talk about what had happened and why he was there. He did talk about stuff, and he did cry a little bit during his interview. And I remember him being embarrassed about it." Anderson stated that, based upon her training and experience, it was not unusual for a child to indicate that he or she did not want to talk about the abuse.

### (c) Sarah Cleaver

Following his interview with Anderson, the victim met with Cleaver at Project Harmony. Cleaver testified that she is a certified pediatric sexual assault nurse examiner which means that she has advanced training to perform evidentiary examinations of sexual assault victims including providing medical, psychological, and forensic care. When Cleaver met with the victim,

[h]e was very upset. He was tearful. He had red, swollen eyes, and flushed cheeks, and he was mad. He was not interested in meeting with me or having any type of exam. He had his kind of arms crossed, and was . . . kind of grimacing, not answering my questions, and not receptive to any healthcare.

Cleaver testified that "[t]here's really no way of knowing how a child is going to react or present during a case of sexual abuse. They all act differently." The victim refused a medical examination.

Later that year, Cleaver had contact with the victim again when he and his mother returned to Project Harmony. Once again the victim was "mad with his arms crossed. Short[-tempered] with me. Did not want to come back." Cleaver testified that the victim's mother informed her that the victim

> [h]ad been getting his routine sexual health education at school, and had come home really upset, expressing he was worried that he might have AIDS. That the teacher had talked about the risk of AIDS being higher in men who have sex with men, and he was just really nervous that he might have contracted an infection.
>
> . . . .
>
> [The victim] had a concern about his penis being a little bit crooked when he had an erection, so we talked about the normalcy of that versus what symptoms would indicate it's purely a medical problem. We talked about therapy and the advantages for health benefits in participating in therapy, regarding his long-term physical and mental health, and healthy relationships.

Cleaver addressed some of the victim's concerns regarding sexually transmitted diseases and provided him reassurance which she testified was important because

> most kids who have been sexually abused have a normal exam, but the consequences of their abuse end up being long-term sequela that have to do with their mental health and their physical health. So kind of the beginning stage of that is letting them know their body is okay, and reassuring them they don't need to have those concerns so that they can move on with their other therapeutic goals.

Cleaver explained:

> Most all children who are sexually abused actually have a normal genital exam and a normal anal exam, meaning that there's no observed injuries or long-term findings that would indicate there had been sexual abuse.
>
> . . . .
>
> Most of the literature that's accepted within the medical community cites rates of finding, meaning something on [the] exam does show definitive evidence of sexual abuse, is less than 5 percent.

She further testified that

> oral contact, touching or fondling, those things aren't going to leave some imprint that that happened.
>
> Even when penetration of the vagina or the anus occurs, that tissue is not the same as skin. We call it mucosa, so it's really moist. It has a high supply of blood and it's really elastic.
>
> The rectum is physiologically designed to hold stool until you're ready to expel it, so the capacity for tolerating changes in, like volume and size is pretty significant.
>
> And thirdly, those tissues, due to the makeup, heal really, really quickly. So even in cases where there might have been even some bleeding or some injury, unless we see

those kids, like immediately after the time of the contact, they're typically healed within hours to days.

Consequently, Cleaver testified that if she had conducted a medical exam of the victim, she would have expected his exam to be "completely normal."

## 4. JURY VERDICT AND SENTENCING

The jury found Ewinger guilty of the charged offense. At the sentencing hearing, the district court stated:

The severity of the offense, the ongoing nature of the assaults over an extended period of time, the fact that [Ewinger was] in complete denial and takes no responsibility for it, again, your need for rehabilitation so as not to be a threat to society when you are released, the fact that this rehabilitation can't begin until you accept that responsibility for your actions and the damage that you have caused, the fact that there's violence involved in this, psychological damage, fear of you hurting [the victim's] mother, just repeated assaults over a long period of time, I have to fashion a sentence that addresses not only your great need for rehabilitation, but something that doesn't depreciate the seriousness of the charge and does not promote disrespect for the law.

The district court also stated:

I think [the victim] probably would have rather just have kept this secret forever than have to go through what he went through, but he was a very brave young man. The fact that one of the reasons he came forward was so that nobody else would have to go through this, I think, is very admirable, and I look at what you did to [the victim], and you stole this child's innocence. You shattered his sense of security. You stole his trust. You forever manipulated what his sense of normal is. And there is no amount of time that will ever restore that to this child.

The court also emphasized that Ewinger was in an elevated position of trust to the victim as his stepfather and his teacher and that Ewinger repeatedly subjected the victim to sexual assaults. The court sentenced Ewinger to 55 to 85 years' imprisonment. Ewinger has timely appealed to this court.

## III. ASSIGNMENTS OF ERROR

Ewinger contends that the trial court erred in (1) granting the State's motion to admit prior bad act evidence, (2) admitting Boer's testimony, (3) failing to grant a mistrial and admitting irrelevant evidence, (4) allowing Cleaver and Anderson to testify as expert witnesses, (5) committing plain error in failing to dismiss and replace the contaminated jury pool, (6) in improperly excluding text messages, (7) in allowing improper comments by the prosecutor during closing arguments, and (8) in imposing an excessive sentence.

Although Ewinger assigned as error that the trial court erred in denying his motion for a new trial, his argument merely consisted of a restatement of his assigned error. Statements which merely restate the assigned error do not constitute the required argument in support of the assigned

error. *State ex rel. City of Alma v. Furnas Cty. Farms*, 266 Neb. 558, 667 N.W.2d 512 (2003). Thus, we decline to address this assignment of error.

Ewinger also contends that his trial counsel committed ineffective assistance of counsel by (a) failing to hire experts; (b) failing to investigate and suppress pornographic website evidence; (c) failing to raise a *Brady* violation; (d) failing to move for a new jury pool; (e) failing to object to improper comments by the prosecutor during closing arguments; (f) failing to offer medical evidence of Ewinger's erectile dysfunction; (g) failing to timely relate a plea bargain; (h) advising Ewinger not to testify; (i) failing to investigate other suspects; (j) ineffectively cross-examining witnesses; (k) failing to investigate impeachment witnesses or, in the alternative, file a motion to continue the trial; (l) committing errors related to the 404 hearing including failing to demand a full evidentiary hearing and failing to demand that the district court apply a higher standard of similarity; (m) failing to object to irrelevant evidence; and (n) failing to object to the expert testimony of Cleaver and Anderson.

Finally, Ewinger contends that, due to all of the errors in the aggregate, a new trial is warranted.

## IV. STANDARD OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Valverde*, 286 Neb. 280, 835 N.W.2d 732 (2013). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Valverde, supra*.

Decisions regarding motions for mistrial are directed to the discretion of the trial court, and will be upheld in the absence of an abuse of discretion. *State v. Briggs*, 303 Neb. 352, 929 N.W.2d 65 (2019).

The standard for reviewing the admissibility of expert testimony is abuse of discretion. *State v. Herrera*, 289 Neb. 575, 856 N.W.2d 310 (2014); *State v. Schramm*, 27 Neb. App. 450, ___ N.W.2d ___ (2019). We review the record de novo to determine whether a trial court has abdicated its gatekeeping function when admitting expert testimony. *State v. Herrera, supra*; *State v. Schramm, supra*.

The retention or rejection of a juror is a matter of discretion for the trial court. *State v. Huff*, 298 Neb. 522, 905 N.W.2d 59 (2017). This rule applies both to the issue of whether a venireperson should be removed for cause and to the situation involving the retention of a juror after the commencement of trial. *Id*. Thus, the standard of review in a case involving discharge of a juror is whether the trial court abused its discretion. *Id*.

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Manjikian*, 303 Neb. 100, 927 N.W.2d 48 (2019).

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether

counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id.*

## V. ANALYSIS

### 1. MOTION TO ADMIT PRIOR BAD ACT EVIDENCE

Ewinger contends that the trial court erred in granting the State's motion to admit prior bad act evidence pursuant to rule 414. Ewinger also contends that, since the State's motion sought to adduce the bad acts evidence pursuant to both rule 404(2) and rule 414, the district court erred in deciding to determine the admission of the evidence solely under rule 414. He argues that this decision allowed the court to use the less stringent "substantially similar" standard governing the admission of evidence pursuant to rule 414 rather than the more stringent "overwhelmingly similar" standard for admission of evidence pursuant to both rule 404 and rule 414.

First, we note that the district court's order specifically stated that "[i]n the present case, the State has stated that they intend to offer the evidence under Rule 414." Because the district court's order specifically indicated that the State did not intend to offer the evidence under rule 404 at trial, the district court properly considered only rule 414 in its analysis of the bad acts evidence.

Second, as the Nebraska Supreme Court held in *State v. Kibbee*, 284 Neb. 72, 91, 815 N.W.2d 872, 889 (2012):

> Although the trial court analyzed the admission of the evidence under § 27-404, we find that the first step in determining whether evidence of prior sexual contacts should be admitted is to review the evidence pursuant to § 27-414. Having conducted such a review, we find no error in the admission of prior acts evidence under § 27-414, and therefore, we do not find it necessary to conduct a separate analysis under § 27-404(2).

As such, once the court deemed that the evidence was admissible under § 27-414, it was not necessary to undergo a § 27-404 analysis and the court did not err in determining the admission of the evidence solely under § 27-414.

Third, during trial, Ewinger preserved his objections to C.A.'s testimony stating:

> [T]he record I'd make is consistent with the record that we made before on the 27-414, that I don't believe the statute [sic] has established probable cause, an initial showing that would justify that, and it's not related in time, and that . . . it's different conduct.
>
> So for those reasons, we'd stand on our original argument on the 27-414.

The district court did not rule on the admissibility of the prior bad act evidence pursuant to § 27-404(2) and Ewinger did not preserve his objection on this basis at trial. See *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012) (on appeal, defendant may not assert different ground for objection to admission of evidence than was offered at trial). For these reasons, we hold the court did not err in failing to consider the admissibility of evidence under § 27-404 or in failing to analyze the admissibility of evidence under standards appropriate to that rule.

As to Ewinger's specific assignment of error governing the court's ruling on rule 414, Ewinger challenges the district court's balancing of factors under § 27-414(3); he does not allege any error relating to either § 27-414(1) or (2). Section 27-414(3) provides:

Before admitting evidence of the accused's commission of another offense or offenses of sexual assault under this section, the court shall conduct a hearing outside the presence of any jury. At the hearing, the rules of evidence shall apply and the court shall apply a section 27-403 balancing and admit the evidence unless the risk of prejudice substantially outweighs the probative value of the evidence. In assessing the balancing, the court may consider any relevant factor such as (a) the probability that the other offense occurred, (b) the proximity in time and intervening circumstances of the other offenses, and (c) the similarity of the other acts to the crime charged.

Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016), provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

In the present case, the district court assessed the factors outlined in § 27-414, finding that there was a high probability that Ewinger sexually assaulted C.A., the circumstances surrounding the assaults were similar, and the assaults occurred close in time. The district court further found that the evidence of the prior sexual assault was more probative than prejudicial. Accordingly, the court held that, pursuant to § 27-414(3), evidence of Ewinger's prior commission of sexual assault of C.A. was admissible.

Ewinger challenges the district court's analysis of each factor claiming that errors committed by the court in analyzing each factor resulted in an improper balancing of the probative value of the evidence in relation to its risk of prejudice. Regarding the first factor, i.e. the probability that the other offense occurred, Ewinger claims that the district court abused its discretion in finding that there was "a high probability that the other offense occurred." Specifically, Ewinger contends that the court "abused its discretion by ignoring C.A.'s inconsistences as well as his motivation to change his testimony over time." Brief for appellant at 17. Regarding the second factor, i.e. proximity in time and intervening circumstances of the other offenses, Ewinger contends that the district court's "factual analysis was inaccurate, and thus the court erred in its analysis of the proximity in time between the offenses." *Id.* at 20. Ewinger also contends the court erred in its comparison of the prior offense to the current offense. He argues that "[i]n the case at bar, the solitary act, inconsistently described by C.A. has little resemblance to the multiple and detailed offenses alleged by [the victim]." *Id.* at 21.

Here, C.A.'s deposition was offered at the rule 414 hearing. In support of the first factor, Ewinger argues that C.A.'s deposition testimony differed from previous accounts given by C.A., that C.A.'s testimony was inconsistent and forgetful, and C.A. admitted having a motive to change his testimony, i.e. that C.A. was upset because he thought that Ewinger was going to try to take C.A. away from C.A.'s mother.

Although we agree that C.A. did not remember events perfectly, he was able to testify that when he was in fifth grade, Ewinger befriended him, bought him gifts, and paid attention to him. Ewinger was his teacher. Then, one night while he and Ewinger were at the school, they slept on an air mattress. According to C.A., Ewinger reached over and started rubbing C.A.'s penis up and down. C.A. testified during his deposition that he thought Ewinger tried to touch him under his clothes, but that he thought that Ewinger only ended up touching him over his clothes. After the

assault, Ewinger then told C.A. not to tell anyone or C.A. would get in trouble. In short, after reviewing the record, we find the court did not abuse its discretion in finding that, in conducting the court's balancing analysis, there was a high probability that Ewinger sexually assaulted C.A.

Second, we acknowledge that the alleged sexual assaults of the victim and C.A. occurred approximately 2 years apart. In considering the question of whether prior acts were too remote in time to be admitted into evidence, we note that the Nebraska Supreme Court has previously found that evidence of prior crimes committed 27 years earlier, 11 to 20 years prior to trial, and 10 years prior to the charged crime, were sufficiently proximate in time to be considered admissible under § 27-404(2). *State v. Kibbee*, 284 Neb. 72, 815 N.W.2d 872 (2012). See, *State v. Valverde*, 286 Neb. 280, 835 N.W.2d 732 (2013); *State v. Stephens*, 237 Neb. 551, 466 N.W.2d 781 (1991); *State v. Yager*, 236 Neb. 481, 461 N.W.2d 741 (1990); *State v. Kern*, 224 Neb. 177, 397 N.W.2d 23 (1986). Although these cases analyzed proximity in time in relation to § 27-404, the Nebraska Supreme Court found that a similar analysis is applicable under § 27-414. See *State v. Kibbee, supra*.

Ewinger then argues the district court erred in its factual analysis in finding "some of the occurrences happened in Sibley, Iowa[,] while [Ewinger] was dating then married K.P.'s mother and while [Ewinger] was a middle school teacher of both boys in Sibley." Brief for appellant at 20. Although we agree that the district court erred in its finding as to the chronology of these events (the assault of K.P. actually occurred between July 1, 2012, and July 31, 2013, before they moved to Sibley), we find that Ewinger's assault of C.A. which occurred approximately 2 years following Ewinger's assault of K.P. to be sufficiently proximate to be considered probative in the court's balancing analysis.

Third, comparing the accounts offered by C.A. and the victim, we note that Ewinger was a teacher of both boys and was in a position of trust and authority. Both boys were young at the time of the abuse, between 8 and 11 years old. Ewinger displayed grooming behaviors with each child and after assaulting each victim, Ewinger threatened each victim. On balance after considering the factors set forth in § 27-404(3), we hold that the factors supported the admission of C.A.'s testimony at trial and this assignment of error fails.

### 2. ADMISSION OF BOER'S TESTIMONY

Ewinger argues that the district court abused its discretion and erred by admitting Boer's "prejudicial and unexpected testimony." Brief for appellant at 28. He contends that "[t]he defense rightfully did not expect the testimony of Boer" as it was not disclosed by the State in the State's motion to offer prior bad acts evidence, or contained within exhibits offered in support of prior bad acts at the designated hearing. Brief for appellant at 27. During trial, Ewinger objected to Boer's testimony on § 27-414 grounds which was overruled by the court. Boer's testimony essentially provided that Boer discovered Ewinger and C.A. sleeping on an air mattress in Ewinger's classroom at the middle school and that, during a later search of Ewinger's classroom desk, he discovered Viagra and a personal lubricant.

Here, the record reflects that immediately prior to Boer's testimony, Ewinger's counsel objected to his testimony in a hearing held outside of the jury's presence. Ewinger's counsel stated:

We anticipate that next the [State] will call an individual by the name of Bill Boer. We believe he's a superintendent of the school up in Sibley, who conducted an

- 12 -

investigation of the allegations regarding [C.A.], that was the subject of the 27-414 evidence.

At the time that the State had the 414 hearing in this case, the only evidence that was presented at that time were depositions of [the victim's mother], depositions of [the victim], and a deposition of [C.A.].

There was no evidence offered at that 27-414 hearing regarding any testimony by Bill Boer, or any of the items that he alleged to have found at the school, including -- what we anticipate he will testify about would be a Viagra prescription bottle and a lubricating jelly that was found in [Ewinger]'s desk drawer at the school in the classroom.

None of that evidence was presented to the court at the 404 hearing; and none of that evidence was discussed in any way, shape, or form in the court's order of December the 6th on the 414 evidence. There's no evidence presented to the court in the form of a hearing for the court to even make a finding that it was intertwined.

So the -- in addition to the analysis that the court used in the 27-414 evidence, the court has to engage in a balancing test under 403. Whether -- even if the court determines that that evidence, even though it's solely related to the investigation involving [C.A.], who is not a victim in this case, it's only a 27-414 victim, if the court makes a determination that Mr. Boer's potential testimony doesn't require a 414 hearing or analysis, that evidence is still subject to 403 analysis.

And he's going to come in and testify that he found Viagra and lubricating jelly in my client's classroom that has absolutely nothing to do with the allegation made by [C.A.]. [C.A.] did not say anything about a lubricating jelly, did not say anything about Viagra, did not say anything about my client taking any pills. It is irrelevant to that investigation.

And so for those reasons -- and it's prejudicial, and has no probative value in regards to the 414 evidence.

So for those reasons, and on relevant, we object to any testimony or evidence regarding Bill Boer.

The court overruled Ewinger's objection finding that the substance of Boer's testimony was addressed in the State's motion and the court's December 6, 2017, order, "either directly or indirectly, I think it's covered. And in addition to the statements, an opening statement regarding impotence, as well as the cross-examination of [C.A.], would allow this testimony to be admissible."

We note that, at the December 21, 2017, motion to endorse witnesses, the State specifically informed the court and defense counsel that "There have been endorsed witnesses from that school, included a superintendent who has personal observation of [C.A.] and the defendant on a mattress in the school, who the State would probably call." The State then clarified:

Your Honor, I'm not intending to offer any evidence regarding anyone other than C.A. or K.P., the named victim in our case.

With respect to the school, I am not sure I fully understand what [defense counsel] is concerned about the State presenting. The State is not going to present evidence that [Ewinger] was terminated because of inappropriate contact with C.A. at the school, but the State is intending to present evidence that school officials found him at the school, on an

air mattress with C.A., observed that themselves personally, and then, as a result, had follow-up conversations with individuals and eventually he was terminated.

Defense counsel responded "And I don't have a problem with that."

We further note that the deposition testimony of the victim's mother, which was received into evidence at the Rule 414 hearing, referenced the incident where the superintendent had discovered Ewinger and C.A. asleep on an air mattress at the school and that Ewinger had Viagra and lubricant at his desk at school. The victim also testified that Ewinger sometimes used a clear lubricant to facilitate the sexual assaults.

Thus, Boer's testimony could hardly be described as "unexpected." Further, although we agree that Boer's testimony was prejudicial to Ewinger, "[m]ost, if not all, evidence offered by a party is calculated to be prejudicial to the opposing party." *State v. Oldson*, 293 Neb. 718, 751, 884 N.W.2d 10, 41 (2016).

Because we find that the subject of Boer's testimony was presented in the rule 414 hearing, in relation to the prior sexual assault of C.A. which evidence of the prior sexual assault the court deemed admissible, that Ewinger was provided notice that the State intended to call Boer and identified the subject matter which the State sought to elicit, that Ewinger did not object to the calling of this witness or subject testimony during that hearing after the subject matter was identified, and that the subject of Boer's testimony was independently relevant to Ewinger's defense that he was impotent, we find that the court did not abuse its discretion in allowing the State to call Boer or testify as he did at trial. This assigned error fails.

### 3. FAILURE TO GRANT MISTRIAL AND ERRONEOUS ADMISSION OF IRRELEVANT EVIDENCE

Ewinger next contends that the district court abused its discretion in failing to grant a mistrial when C.A. testified to an "inappropriate" event that occurred when he stayed over at Ewinger's home and then compounded that error by then erroneously allowing the admission of irrelevant evidence, i.e. the victim's mother's testimony that C.A. would sleep over and her opinion that the sleepovers were inappropriate.

A mistrial is properly granted in a criminal case where an event occurs during the course of a trial that is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *State v. Briggs*, 303 Neb. 352, 929 N.W.2d 65 (2019). The defendant must prove that the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice. *Id.*

During the State's case, the following exchange occurred between the prosecutor and C.A.:

Q. . . . did anything inappropriate ever happen when you were with the defendant?
A. Yes.
Q. Can you tell us when that was?
A. I think the night when -- sometimes maybe when I slept over at his house.

Ewinger's counsel objected, noting that C.A.'s testimony regarding any incident at Ewinger's house had never been mentioned previously. The court struck C.A.'s answer and ordered the jury

- 14 -

to disregard it. It was only after C.A. had concluded his testimony that Ewinger's counsel moved for a mistrial, which motion was denied.

It is quite clear that the answer given by the child witness to the State's question was unexpected and unanticipated by both the State and defense counsel. After giving the answer, C.A. was immediately stopped and the court remedied the situation by striking the answer and instructing the jury to disregard it. Error cannot ordinarily be predicated on the failure to grant a mistrial if an objection or motion to strike the improper material is sustained and the jury is admonished to disregard such material. *Id*. Due to the equivocal and isolated nature of C.A.'s unexpected response, we believe that the court's admonishment was sufficient to overcome any potential prejudice resulting from C.A.'s answer and we therefore conclude that the court did not abuse its discretion in overruling Ewinger's motion for mistrial.

Ewinger then argues that the district court erred in allowing testimony from the victim's mother regarding C.A. sleeping over at her and Ewinger's home. However, Ewinger did not object to the testimony of which he now complains. It is well settled that failure to make a timely objection waives the right to assert prejudicial error on appeal. *State v. Casterline,* 293 Neb. 41, 878 N.W.2d 38 (2016); *State v. Huerta*, 26 Neb. App. 170, 917 N.W.2d 175 (2018). Accordingly, this claim fails.

### 4. Admission of Expert Witness Testimony

Ewinger next contends that the district court erred by allowing Cleaver and Anderson to testify as expert witnesses during trial. Ewinger argues that the district court abused its discretion in allowing Cleaver to testify as an expert because "[s]he was not qualified as an expert, [t]he State had not endorsed her as an expert witness and the testimony was unanticipated," and "[t]he testimony had not been previously disclosed and was not subjected to a [*Daubert*/*Schafersman*] challenge." Brief for appellant at 33. Similarly, Ewinger argues that the district court erred in allowing Anderson to testify as an expert regarding various concepts including how child abuse can impact a child victim's memory and impact disclosure. *Id.* at 33-34. However, Ewinger's counsel did not specifically object to either Cleaver or Anderson's testimony on the basis of either witnesses' qualification as an expert nor request that the district court make specific findings as to either witnesses' qualifications. Instead, through the course of testimony by Cleaver and Anderson, Ewinger made various objections to specific questions varying from form of the question to foundation, but Ewinger never specifically challenged either witnesses' qualifications as an expert or attacked specific findings on the basis of the witness' improper expertise.

A similar issue was considered by the Nebraska Supreme Court in *State v. Schwaderer*, 296 Neb. 932, 944-45, 898 N.W.2d 318, 330 (2017), wherein the Nebraska Supreme Court held:

Schwaderer next alleges that the witness who previously worked with the narcotics unit was not an expert witness. He argues that the witness was not properly qualified and that the court did not follow the proper procedure in determining whether expert testimony was admissible. The State argues that Schwaderer waived this argument. We agree.

Failure to make a timely objection waives the right to assert prejudicial error on appeal. At trial, Schwaderer continuously objected to the witness' testimony on foundation and relevance grounds and challenged the qualifications of the witness during closing argument. But, he never specifically objected to the witness' qualification as an expert or

asked the court to make specific findings as to the witness' qualifications. And, he cannot assert a new ground for his objection to the witness' testimony for the first time on appeal. Therefore, Schwaderer waived his right to assert this assignment of error.

Here, the same factual pattern requires the same result. Defense counsel failed to specifically object to Anderson and Cleaver's qualifications as experts and failed to request that the district court make specific findings as to their qualifications.

On appeal, a defendant may not assert a different ground for his or her objection than was offered at trial. *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018). Accordingly, Ewinger has waived appellate review regarding this claim.

### 5. ALLEGED PLAIN ERROR REGARDING JURY POOL

Ewinger claims that the district court committed plain error in failing to dismiss and replace the contaminated jury pool. Plain error may be found on appeal when an error unasserted or uncomplained of at trial is plainly evident from the record, affects a litigant's substantial right, and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Briggs*, 303 Neb. 352, 929 N.W.2d 65 (2019).

Ewinger's assignment relates to the following colloquy that occurred between the prosecutor and the prospective juror regarding the presumption of innocence:

[Prosecutor]: . . . If you listen through the testimony and believe that the State had proven each of those elements beyond a reasonable doubt, could you then find [Ewinger] guilty?

. . . .

[Prospective Juror]: . . . I don't know if I am necessarily in agreement with that because of my skill set.

[Prosecutor]: Okay.

[Prospective Juror]: It's something I can't shut off.

[Prosecutor]: Tell me about it.

[Prospective Juror]: It's behavior detection. So I can tell even by watching the courtroom certain things. I can't give you the information, but I can watch things and with the behavior detection analysis program that I am in, it kind of tells me what's what and what's not. That's something I can't shut off.

[Prosecutor]: Right. But if you had to decide right now, knowing that the law is that [Ewinger]'s presumed innocent until the State proves every element beyond a reasonable doubt, what would your verdict be right now?

Prospective Juror]: Probably guilty.

[Prosecutor]: Okay.

[Prospective Juror]: Just with my skill set.

[Prosecutor]: Right. I understand that.

[Prospective Juror]: You see where I'm at?

[Prosecutor]: I do. I do. I understand; although, you know, we're going to get talking about later how we determine what we believe and who we believe and those kind of things, which I think goes to the skill set you're talking about.

- 16 -

[Prospective Juror]: Okay.

[Prosecutor]: And that's called -- for our purposes, that's called credibility, assessing credibility.

[Prospective Juror]: Right.

[Prosecutor]: What we believe of what a person's saying, why we believe it, what kinds of things we look for to determine whether we believe things.

[Prospective Juror]: Okay

[Prosecutor]: Okay. Do you think that you could listen to every witness who comes in here, all of the evidence that's presented, and assess credibility as you go through the trial and then --

[Prospective Juror]: I can do that.

[Prosecutor]: -- make a decision at the end once you've heard everything?

[Prospective Juror]: Okay. Yeah, I could probably do that.

[Prosecutor]: Okay

[Prospective Juror]: Yeah, that is part of my job, but just go with the initial exposure first.

[Prosecutor]: Right. And everyone has -- even without your skill set, everyone has a gut reaction. I know it's different, I understand that it's different, but -- but we don't make that final decision based on our initial --

[Prospective Juror]: Correct.

[Prosecutor]: -- response. We have to listen to everything.

[Prospective Juror]: Yes.

[Prosecutor]: Do you agree that you can do that?

[Prospective Juror]: I do.

[Prosecutor]: And assess credibility of everyone as we go?

[Prospective Juror]: Yeah.

[Prosecutor]: And make a determination based on everything at the end of the trial?

[Prospective Juror]: I can do that. I just didn't know if it was fair, though, to have somebody with that extra --

[Prosecutor]: Training.

[Prospective Juror]: -- training in something that I do that for a living.

[Prosecutor]: And tell us more about your job.

[Prospective Juror]: Well, I work for TSA and our job is to find the people that are not honest and that are a threat to us and stuff like that, so we do that with [a] behavior analysis program which we take a combination of behaviors in a mathematic program and we can pretty much assess somebody and let them know that we need to address them.

[Prosecutor]: Right. But even if you believe you need to address them, does that necessarily mean they're guilty of anything?

[Prospective Juror]: That means they got something on them.

[Prosecutor]: They got something suspicious?

[Prospective Juror]: Something's not right.

[Prosecutor]: Okay.

[Prospective Juror]: Almost 100 percent sure something's not right, yeah.

Ewinger also contends that the prosecutor compounded the error by making the following comment while discussing the concept of reasonable doubt with the prospective jurors:

> It's not proof beyond all possible doubt because that's not how our brains work. We aren't computers. We don't calculate things to a certain percentage of certainty, except maybe [the prospective juror]. But it's not 100 percent. It's so strong that you would rely on it in making those big, important decisions in your life.

Ewinger contends that, by making this comment, "[i]t appears that the State endorsed [the prospective juror]'s skills which, in turn, bolstered her conclusion that [Ewinger] was 'probably guilty.'" Brief for appellant at 36.

In *State v. Newman*, 290 Neb. 572, 861 N.W.2d 123 (2015), the Nebraska Supreme Court considered a defendant's claim that the district court should have granted his motion for mistrial because the entire jury pool was tainted by comments made by a prospective juror during voir dire. After the prospective juror's response, the State moved to strike the juror for cause, there was no objection, and the juror was stricken. The defendant moved for mistrial claiming that the prospective juror's comments were inflammatory and had polluted the entire jury pool. The district court overruled the motion. The Nebraska Supreme Court held:

> Newman argues that the district court should have granted his motion for mistrial, because a new jury venire was the only remedy that could have cured the prejudice caused by the prospective juror's comments. However, the record affirmatively shows that Newman was not deprived of a fair trial by the juror's comments.
>
> After the prospective juror's comments, the juror was stricken for cause and the defendants were permitted to question other prospective jurors as to their reactions to the comments. The questioned jurors expressed that their opinions had not been influenced by the juror's comments. Thus, we find no abuse of discretion in the district court's refusal to grant a mistrial. This assignment of error is without merit.

*State v. Newman*, 290 Neb. at 587-88, 861 N.W.2d at 137.

Here, after the prospective juror's comments, voir dire continued and both the State and Ewinger questioned the other jurors. After the prospective juror's comments, the prosecutor asked other jurors whether they had any issues with the presumption of innocence or with the fact that, right then, if asked, they would have to vote not guilty because no evidence had been adduced. A few other jurors expressed an issue with the presumption of innocence and none of the stated reasons were due to the prospective juror's comments. Both the State and Ewinger passed the jury for cause and the prospective juror did not serve as either a juror or alternate juror. The record establishes that comments made by the prospective juror did not contaminate the jury pool so as to deprive Ewinger of a fair trial. Accordingly, we find no plain error in the district court's failure to dismiss and replace the jury pool.

## 6. EXCLUSION OF TEXT MESSAGES

Ewinger also claims that the district court erred in excluding various text messages as hearsay including text messages included in exhibits 61, 62, and 63, which he included as part of his offer of proof.

Hearsay is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted. Neb. Rev. Stat. § 27-801(3) (Reissue 2016); *State v. Hibler*, 302 Neb. 325, 923 N.W.2d 398 (2019). Hearsay is not admissible unless a specific exception to the hearsay rule applies. Neb. Rev. Stat. § 27-802 (Reissue 2016); *State v. Hibler, supra*.

Exhibits 61 through 63 contained copies of portions of text messages between the victim's mother and Ewinger on January 30, 2016; January 31, 2016; and February 7, 2016. The text messages, which are out-of-court statements, indicate that the victim's mother was aware of the allegations regarding C.A. and captured the victim's mother and Ewinger's discussion of this and other topics as it related to their relationship. Ewinger argues that he was not offering these text messages for the truth of the matter asserted. Instead, he argues that "the [text] messages show motive and intent and indicate that the allegations regarding C.A. added to the already-tense situation, suggesting that [the victim] was angry because of the C.A. situation." Brief for appellant at 37. He argues that "[a] statement offered to prove its impact on the listener, instead of its truth, is offered for a valid nonhearsay purpose if the listener's knowledge, belief, response, or state of mind after hearing the statement is relevant to an issue in the case." *State v. McCave*, 282 Neb. 500, 533-34, 805 N.W.2d 290, 318 (2011).

Although Ewinger's citation and reference to *State v. McCave* is a correct statement of the law, we disagree with his application to the facts of the instant case. Even though a listener's response after hearing a statement may be offered if the hearer's response is relevant to an issue in the case, that proposition is not applicable to the texts offered by Ewinger as exhibits 61, 62, and 63. The text messages fail to reveal evidence of the victim's mother reacting to rumors regarding C.A. that are suggestive of any motive by her; the text messages can more aptly be described as an exchange between them as it relates to the current status of their relationship, the victim's mother's confusion, and how to deal with multiple issues impacting their relationship and the victim. On balance, the text messages do not sufficiently indicate relevant information relating to motive or intent in response to a hearsay statement and the court did not abuse its discretion in refusing to admit them for a valid non-hearsay purpose.

### 7. ALLEGED PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENTS

Next, Ewinger contends that the district court erred in allowing improper comments by the prosecutor during closing arguments. Specifically, he contends that the State's closing argument suggested to the jury that Ewinger "is a 'monster' and . . . that [he] was in possession of child pornography when the evidence did not support that argument." Brief for appellant at 38. Ewinger also points to the prosecutor's argument that "We don't have to prove that he was in possession of child porn. He's not charged with that here today."

"In order to preserve, as a ground of appeal, an opponent's misconduct during closing argument, the aggrieved party must have objected to improper remarks no later than at the conclusion of the argument." *State v. Cullen*, 292 Neb. 30, 53, 870 N.W.2d 784, 802 (2015). Ewinger's counsel did not object to the prosecutor's statements during closing arguments. As such, Ewinger did not preserve for appeal issues to which he did not object at trial.

Because Ewinger did not timely object to the prosecutor's comments, we review this issue only for plain error.

> Plain error may be found on appeal when an error, unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. But, as we have noted, "'the plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'"
>
> Prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial, and prosecutors are not to inflame the prejudices or excite the passions of the jury against the accused. A prosecutor's conduct that does not mislead and unduly influence the jury does not constitute misconduct.

*Id.* at 54, 870 N.W.2d at 802-03. Further, as the Nebraska Supreme Court stated in *State v. Dubray,* 289 Neb. 208, 227, 854 N.W.2d 584, 604 (2014), "[b]ut when a prosecutor's comments rest on reasonably drawn inferences from the evidence, he or she is permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence and to highlight the relative believability of witnesses for the State and the defense."

Here, the prosecutor's remarks about Ewinger's possession of child pornography was related to the State's theory that Ewinger sexually assaulted his young stepson. In connection with that theory, the victim's mother testified to her discovery of Ewinger conducting searches for pornographic material which material related to the alleged charged offense. Further, the prosecutor's isolated remarks about "monsters," although improper, did not mislead the jury or otherwise unduly influence the jury considering the overwhelming amount of evidence produced by the State. There was no plain error here and this assigned error fails.

### 8. EXCESSIVE SENTENCE

Ewinger also contends that the sentence of 55 to 85 years' imprisonment imposed upon him was excessive. Ewinger was convicted of a Class IB felony which, at the time of the commission of the offense, was punishable by 20 years' to life imprisonment. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2012). Ewinger's sentence of 55 to 85 years' imprisonment is within the statutory sentencing range.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Chacon*, 296 Neb. 203, 894 N.W.2d 238 (2017). When imposing a sentence, the sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the offense. *Id*. The sentencing court is not limited to any mathematically applied set of factors. *Id*.

At the time that the presentence investigation report (PSR) was prepared, Ewinger was 39 years old, had earned a bachelor's degree, and was divorced from the victim's mother. His previous

criminal history consisted only of speeding offenses but he had been charged in Iowa with felony second degree sexual abuse with that charge pending trial. The Vermont Assessment for Sex Offender Risk assessed Ewinger as a moderate-high risk to reoffend. The probation officer who completed the PSR noted:

> The seriousness of this offense cannot be ignored. [Ewinger] was involved as a youth coach for multiple sports. He was a trusted mentor and advisor for many youth, including his own step-son. He betrayed that trust and physically and mentally harmed [the victim]. The victim will be dealing with the trauma caused by Mr. Ewinger for the rest of his life.

Based upon the factors that the sentence imposed was within the statutory sentencing range; Ewinger's risk to reoffend; the severity of the offense; the fact that there were numerous assaults which took place over an extended period of time; Ewinger's complete denial regarding the assaults; the physical and mental harm to the victim including the psychological damage caused by Ewinger's threats to harm the victim and his mother if the victim told about the assaults; Ewinger's elevated position of trust to the victim as his stepfather and his teacher; the need to protect the public; and the fact that a lesser sentence would depreciate the seriousness of the charge and would promote disrespect for the law, the sentence imposed was not an abuse of discretion.

### 9. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Ewinger also contends that this trial counsel committed ineffective assistance of counsel by (a) failing to hire experts; (b) failing to investigate and suppress pornographic website evidence; (c) failing to raise a *Brady* violation; (d) failing to move for a new jury pool; (e) failing to object to improper comments by the prosecutor during closing arguments; (f) failing to offer medical evidence of Ewinger's erectile dysfunction; (g) failing to timely relate a plea bargain; (h) advising Ewinger not to testify; (i) failing to investigate other suspects; (j) ineffectively cross-examining witnesses; (k) failing to investigate impeachment witnesses or, in the alternative, file a motion to continue the trial; (l) committing errors related to the 404 hearing including failing to demand a full evidentiary hearing and failing to demand that the district court apply a higher standard of similarity; (m) failing to object to irrelevant evidence; and (n) failing to object to the expert testimony of Cleaver and Anderson.

Ewinger has different counsel on direct appeal. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019).

Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Blaha, supra*. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id*. The two prongs of the ineffective assistance of counsel test under *Strickland* may be addressed in either order. *State v. Blaha, supra*. Thus, in reviewing Ewinger's claims of ineffective assistance of counsel on direct appeal, we decide only

whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.

### (a) Failure to Hire Experts

Ewinger contends that defense counsel was ineffective in failing to hire experts to provide testimony to the jury. He contends:

> Said expert testimony would have provided the jury with peer-reviewed, scientific literature, and testimony to assist the triers of fact. The jury should have been educated as to why children make false allegations of abuse and the science of suggestibility. This expert testimony should also have included relevant science-based research on the suggestibility of children, memory contamination, and how alternative sources can provide children with the knowledge to make such allegations. . . . Due to trial counsel's failure to provide the jury with such expert testimony and scientific knowledge, the jury was at a disadvantage. This lack of knowledge resulted in a conviction.

Brief for appellant at 39.

This allegation is sufficiently stated but the record on direct appeal is insufficient to resolve it. In reaching this conclusion, we note the recent pronouncement from the Nebraska Supreme Court in *State v. Stelly*, 304 Neb. 33, 63-64, 932 N.W.2d 857, 879 (2019):

> We emphasize two important points about our conclusion that the record is insufficient to resolve these claims.
>
> First, when an appellate court finds, on direct appeal, that the record is not sufficient to resolve a claim of ineffective assistance, it should not be misunderstood as a finding that the claim will necessarily require an evidentiary hearing if raised in a motion for postconviction relief, because that determination is governed by an entirely different standard.
>
> And second, just because an appellate court finds the record on direct appeal is insufficient to resolve a claim of ineffective assistance, it does not mean that a postconviction court will necessarily be precluded from later finding the existing record affirmatively refutes the same claim. Several factors make this so. Sometimes, critical portions of the existing trial record are not included in the appellate record, but are later available to the postconviction court. Additionally, because a defendant on direct appeal is not required to make specific allegations of prejudice, the appellate court often has an incomplete understanding of how a defendant claims to have been prejudiced by certain deficient conduct. Consequently, a finding on direct appeal that the existing record is insufficient to determine a claim of deficient conduct does not speak to whether the existing record will be sufficient to affirmatively refute prejudice once the claim is alleged on postconviction.

- 22 -

(b) Failure to Investigate and Suppress
Pornographic Website Evidence

Ewinger next claims his trial counsel was ineffective in failing to investigate and suppress pornographic website evidence. Specifically, he contends that counsel was ineffective in failing to

investigat[e] the forensic history of the [pornographic evidence] material provided to the detective. Counsel should have hired a computer forensics examiner to determine the nuances of the app or apps which were installed [by the victim's mother on Ewinger's phone], how [the apps] operated and what material could have been preserved. The digital chain of custody should have been investigated and preserved. . . .

Defendant's motion in limine should have been preceded by a review of [the victim's mother]'s phone by a forensic expert to determine if she had actually installed a spyware app, and what information or browser history, in any, was obtained from Defendant's phone. An independent third-party forensic review [of] [the victim's mother] and Defendant's phone should have been conducted by Defendant's trial counsel pre-trial. As a consequence, [the victim's mother]'s untrue testimony went unchallenged.

Brief for appellant at 41. The record on appeal is insufficient to address this claim.

(c) Failure to Raise *Brady* Violation

Ewinger alleges that his trial counsel was ineffective for failing to raise discovery rule violations. He alleges that "on the second day of trial, defense counsel showed him the porn site evidence collected by the victim's mother and shared with [law enforcement]. The timing suggests that defense counsel had not seen the evidence prior to the trial, in which case he should have raised a *Brady* violation and objected pursuant to a violation of the Order for Discovery . . . and moved to exclude the damning discovery and testimony by [the victim's mother]." Brief for appellant at 41-42. Ewinger acknowledges that "[u]ltimately, the porn was not entered into evidence, but [the victim's mother] was allowed to describe it." *Id.* at 42.

The Nebraska Supreme Court has explained:

In *Brady v. Maryland*, [373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963),] the U.S. Supreme Court laid down the principle that irrespective of the good or bad faith of the prosecution, its suppression of evidence favorable to an accused violates due process if the evidence is material to either guilt or punishment. The purpose of the *Brady* rule is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure the disclosure of evidence of such significance that, if suppressed, would deprive the defendant of a fair trial. As refined by subsequent case law, there are three components to a *Brady* violation: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued such that there is a reasonable probability that the suppressed evidence would have produced a different verdict; i.e., the suppressed evidence must be '"material either to guilt or to punishment.'" [See *Strickler v. Greene*, 527 U.S. 263, 280, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999) (quoting *Brady v. Maryland, supra*).]

As Clifton points out, the U.S. Supreme Court's decision in *United States v. Bagley* clarified that there is no distinction between impeachment evidence and exculpatory evidence. Evidence that might be used to impeach the prosecution's witnesses is "'"evidence favorable to the accused" [because] if disclosed and used effectively, it may make the difference between conviction and acquittal.'"

*State v. Clifton*, 296 Neb. 135, 162-63, 892 N.W.2d 112, 134 (2017).

Here, the record reflects that, at a pretrial hearing held in December 2017, defense counsel acknowledged that the victim's mother had alleged that Ewinger was involved

in some internet searches, homosexual activity, and older person/younger person kind of internet searches. Something was provided to law enforcement, but it's very unclear as to what that was. It doesn't appear to be anything from my client's computer or his phone. It appears to be that [the victim's mother] pulled up some website, printed it off and said, "This is the website that I saw him visiting."

Additionally, during trial, the State indicated that the list of websites that the victim's mother provided to the police had been provided during discovery and defense counsel concedes that this evidence was disclosed in May 2017 stating "[t]he disclosure wasn't until May." Because the record sufficiently demonstrates that the list of websites that the victim's mother had provided to police was provided during discovery prior to trial, this allegation of ineffective assistance of counsel fails.

### (d) Failure to Move for New Jury Pool

Ewinger contends that his trial counsel was ineffective for failing to move for a new jury panel after the prospective juror announced to the jury that, based on the special skill set learned in her role with the Department of Homeland Security, that Ewinger was probably guilty. Ewinger argues that, because of trial counsel's ineffectiveness, he was denied a fair trial before an unbiased, impartial jury. Having determined earlier in this opinion that the record establishes that comments made by the prospective juror did not contaminate the jury pool so as to deprive Ewinger of a fair trial and the district court did not commit plain error in failing to dismiss and replace the jury pool, Ewinger's trial counsel could not have been ineffective for failing to move for a new jury panel. As a matter of law, counsel cannot be ineffective for failing to raise a meritless argument. *State v. Schwaderer*, 296 Neb. 932, 898 N.W.2d 318 (2017). Thus, this assignment of error fails.

### (e) Failure to Object to Improper Comments by Prosecutor During Closing Arguments

Ewinger contends that his trial counsel was ineffective for failing to object to alleged improper comments made by the prosecutor during closing arguments that Ewinger was a "monster" and that he was in possession of child pornography. Specifically, the prosecutor's closing arguments relating to these specific allegations are as follows:

We don't have to prove that [Ewinger] was in possession of child porn. He's not charged with that here today. . . .

. . . .

- 24 -

You know, as parents, we tell our children when they come into our rooms at night, "don't worry, monsters aren't real. It will be okay." But at just eight to nine years old, [the victim] learned the truth, monsters are real. And scariest of all is that they look just like you and me.

*In State v. Nolan*, 292 Neb. 118, 134-35, 870 N.W.2d 806, 821-22 (2015), the Nebraska Supreme Court stated:

[P]rosecutors are charged with the duty to conduct criminal trials in a manner that provides the accused with a fair and impartial trial. *State v. Dubray,* 289 Neb. 208, 854 N.W.2d 584 (2014). Because prosecutors are held to a high standard for a wide range of duties, the term "prosecutorial misconduct" cannot be neatly defined. *Id.* Generally, prosecutorial misconduct encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial. *Id.*

Generally, in assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper. *State v. Gresham,* 276 Neb. 187, 752 N.W.2d 571 (2008); *State v. Barfield,* 272 Neb. 502, 723 N.W.2d 303 (2006), *disapproved on other grounds, State v. McCulloch,* 274 Neb. 636, 742 N.W.2d 727 (2007). It is then necessary to determine the extent to which the improper remarks had a prejudicial effect on the defendant's right to a fair trial. *Id.*

In *State v. Barfield, supra,* during closing arguments, the prosecutor strongly insinuated that all defense lawyers are liars. We stated, inter alia, that the evidence in the case was not overwhelming and that the credibility of the witnesses was a key factor and that accordingly, "the implication that defense counsel was a liar, and by extension was willing to suborn perjury, was highly prejudicial when viewed in that context." *Id.* at 516, 723 N.W.2d at 315. We concluded that the prosecutor's remarks were misconduct and required a new trial.

However, in *Dubray,* we stated: "[W]hen a prosecutor's comments rest on reasonably drawn inferences from the evidence, he or she is permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence and to highlight the relative believability of witnesses for the State and the defense. These types of comments are a major purpose of summation, and they are distinguishable from attacking a defense counsel's personal character or stating a personal opinion about the character of a defendant or witness. So a distinction exists between arguing that a defense strategy is intended to distract jurors from what the evidence shows, which is not misconduct, and arguing that a defense counsel is deceitful, which is misconduct." 289 Neb. at 227, 854 N.W.2d at 604-05.

Here, there are two references made by counsel during closing arguments to which Ewinger claims his counsel should have objected and was insufficient for failing to do so. The first was an isolated reference to Ewinger being a "monster" and the second was counsel's reference to Ewinger being in possession of child pornography.

The Nebraska Supreme Court has previously held that where the prosecutor's remarks during closing arguments referred to the defendant as a monster and the words to the effect that all

defense attorneys were liars, the case presented the rare instance in where unobjected-to prosecutorial misconduct constituted plain error requiring a new trial. *State v. Barfield*, 272 Neb. 502, 723 N.W.2d 303 (2006), *disapproved on other grounds, State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007). In making that ruling, the Court in *Barfield* noted that "[r]egarding the extent to which this type of inappropriate comment is generally considered to have denied a defendant a fair trial, we recognize that '[h]yperbole in closing arguments is hardly rare, and juries should be given credit for the ability to filter out oratorical flourishes.'" *Id*. at 513-14, 723 N.W.2d at 313-14. But what differentiated *Barfield* was the prosecutor's additional statements in rebuttal to the jury where he insinuated that all defense attorneys were liars. In noting that the statement was gravely improper, the Nebraska Supreme Court ultimately found these statements sufficiently prejudicial to warrant a new trial. Unlike *Barfield*, the prosecutor's isolated reference to Ewinger as a "monster," although improper, does not rise to the level of prejudice as to warrant a retrial of the action. Accordingly, Ewinger's failure to object to this isolated reference did not result in prejudice to Ewinger and does not provide the basis for a claim of ineffective assistance.

Second, counsel's failure to object to the prosecutor's isolated reference to Ewinger being in possession of pornography also does not state a claim for ineffective assistance of counsel. During trial, the victim's mother testified about finding searches on Ewinger's phone relating to pornographic web sites. As the Nebraska Supreme Court stated in *State v. Dubray,* 289 Neb. 208, 227, 854 N.W.2d 584, 604 (2014), "[b]ut when a prosecutor's comments rest on reasonably drawn inferences from the evidence, he or she is permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence and to highlight the relative believability of witnesses for the State and the defense." Here, the State's theory was that Ewinger sexually assaulted his young stepson. In connection with that theory, the victim's mother testified to her discovery of Ewinger conducting searches for pornographic material which material related to the alleged charged offense. Had Ewinger's counsel objected to the prosecutor's argument, such objection would have been properly overruled. Counsel is not ineffective for failing to make an objection that has no merit. *State v. Tyler*, 301 Neb. 365, 918 N.W.2d 306 (2018). Accordingly, Ewinger's claim of ineffective assistance of counsel on this basis fails.

### (f) Failure to Offer Medical Evidence

Ewinger claims his trial counsel was ineffective in failing to offer medical evidence of Ewinger's erectile dysfunction including "failing to call Defendant's doctors to testify that Defendant suffered from erectile dysfunction, suffered from low testosterone levels, and to explain why Defendant was prescribed Viagra and other related medications." Brief for appellant at 43. He contends that "his doctors' testimonies would have raised, at minimum, a reasonable doubt necessary for a not guilty verdict." *Id*. The record on appeal is insufficient to address this claim.

### (g) Failure to Timely Relate Plea Bargain

Ewinger claims that his trial counsel was ineffective for failing to timely relate a plea bargain. Specifically, he alleges:

> Following jury selection, Defense Counsel first advised Defendant of a plea bargain. Counsel advised Defendant, that the State was offering to allow Defendant to plead to one count of Attempted First Degree Sexual Assault of a Child . . . Defendant argues that the

prosecution had a duty to relay the plea bargain in a timely fashion, and because . . . of the delay, Defendant was not afforded the time necessary to properly consider [the plea offer].

Brief for appellant at 43.

Although we agree that "as a general rule, defense counsel has the duty to communicate to the defendant all formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the defendant," *State v. Alfredson*, 287 Neb. 477, 485, 842 N.W.2d 815, 821-22 (2014), here, Ewinger has not alleged any ineffectiveness by trial counsel. He contends that the "prosecution" had a duty to relay a plea bargain in a timely fashion; he makes no claim that defense counsel either failed to relay, or failed to timely relay, the plea offer once it was proffered by the State. Since Ewinger has not alleged any deficient performance by his trial counsel, this claim fails.

(h) Advising Ewinger Not to Testify

Ewinger claims that his trial counsel was ineffective in advising him not to testify. He claims that, "[b]y not testifying, Defendant was highly prejudiced. He was not able to assert and explain his innocence to the jury, testify to his erectile dysfunction, his low-testosterone [sic], and other medical issues. He would also [have] been able to rectify inaccuracies and contradictions in other trial testimonies." Brief for appellant at 43. The record on appeal is insufficient to address this claim. See *State v. Iromuanya*, 282 Neb. 798, 806 N.W.2d 404 (2011) (waiver on record of right to testify does not necessarily waive claim of ineffective assistance of counsel on reasonableness of advice not to testify).

(i) Failure to Investigate Other Suspects

Ewinger also contends his trial counsel was ineffective for failing to investigate other suspects. He contends:

It is possible that [the victim] may have been subjected to sexual assault by a third party, however that possibility was not investigated. It is possible that due to an array of factors, [the victim] was projecting the abuse from the actual perpetrator or another third party, on to [the] Defendant. This failure to investigate may have caused Defendant to miss exculpatory evidence.

Brief for appellant at 44. Ewinger does not, however, identify any potential perpetrators or suspects. An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court. *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018). We find that Ewinger's allegations are not sufficient to raise this claim on direct appeal because a potential postconviction court could not identify if a particular failure to identify a potential perpetrator or suspect claim was the same one raised on direct appeal. This claim fails.

## (j) Ineffective Cross-Examination of Witnesses

Ewinger also contends that his trial counsel was ineffective in failing to properly cross-examine the State's witnesses.

In *State v. Sinkey*, 303 Neb. 345, 929 N.W.2d 35 (2019), the defendant alleged that his defense counsel was ineffective by failing to adequately cross-examine certain witnesses at trial and failing altogether to cross-examine other witnesses. The defendant specifically referenced concerns with trial counsel's cross-examination of a detective and of the victim's mother and also argued that counsel was ineffective in failing to offer any testimony or evidence adverse to the State's case or present any witnesses "who may have spoken to his client's positive traits or lack of propensity to commit acts like those alleged at trial." *Id*. at 350, 929 N.W.2d at 39. The Nebraska Supreme Court concluded that the defendant had failed to allege ineffective assistance of counsel with sufficient particularity noting that, although the defendant had alleged that his defense counsel's performance was inadequate, he failed to include allegations relating what counsel could have argued or done differently in the defense. Further, the Nebraska Supreme Court noted that, although the defendant said that his counsel only "lightly" cross-examined the detective and the victim's mother, the defendant failed to identify what questions should have been asked that would have contributed to his defense.

Here, Ewinger alleges that his trial counsel was ineffective for failing to properly cross-examine the State's witnesses, but does not identify which of the State's witnesses were not properly cross-examined and failed to include allegations relating what his counsel could have argued or done differently in his defense. Accordingly, we conclude that Ewinger has failed to allege this claim with sufficient particularity and, as a result, it fails.

## (k) Failure to Investigate Impeachment Witnesses
## or Move to Continue Trial

Ewinger next contends that his trial counsel was ineffective in failing to investigate impeachment witnesses in opposition to C.A.'s testimony or, in the alternative, file a motion to continue the trial for the purpose of investigating impeachment witnesses.

First, we note that Ewinger has not identified any potential impeachment witnesses. As we previously stated, an ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court. *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018). We find that Ewinger's allegations are not sufficient to raise this claim on direct appeal, because a potential postconviction court could not identify if a particular failure to investigate an impeachment witness claim was the same one raised on direct appeal.

Second, Ewinger also claims that his trial counsel was ineffective for failing to file a motion to continue the trial for the purpose of investigating the aforementioned impeachment witnesses. As we noted in the preceding paragraph, Ewinger failed to identify any impeachment witnesses that he claims his counsel failed to investigate. Because Ewinger has failed to identify any potential impeachment witnesses, he has failed to sufficiently allege any basis for allegation that his trial

counsel was ineffective for failing to file a motion to continue to investigate the unnamed impeachment witnesses. This assignment fails.

(l) Alleged Errors Relating to 404 Hearing

Ewinger claims that his trial counsel was ineffective related to alleged errors regarding the 404 hearing. Specifically, Ewinger claims that defense counsel was ineffective for failing to demand a full evidentiary hearing on the 404 issue rather than submitting the issue to the district court on the deposition of C.A., the victim, and the victim's mother. Ewinger also contends that:

> Defense counsel was ineffective for not asking the court to follow the higher "overwhelming similarity" standard, as the [State's] motion was clearly brought pursuant to both Rule 414 and Rule 404. While [Ewinger] maintains that the two alleged offenses are not sufficiently similar, they are certainly not overwhelmingly similar. Had defense counsel argued for the overwhelmingly [sic] similarity standard to have been employed, C.A.'s testimony would have been kept out. Or the protections afforded under Rule 404 would have allowed for limiting jury instructions and the evidence not necessarily [to] be received as propensity evidence. By not properly arguing the standard, . . . defense counsel committed ineffective assistance of counsel, and [Ewinger] suffered the harm of the [district court] sustaining the State's motion and the jury finding [Ewinger] guilty, [Ewinger] would not have been convicted on this improper basis.

Brief for appellant at 25-26.

First, in relation to counsel's alleged failure to demand a full evidentiary hearing rather than allowing the submission of deposition transcripts, Ewinger fails to identify any particular testimony or evidence which would have been different had the testimony been live or what additional live testimony should have been presented at the hearing. We hold that Ewinger's allegations are not sufficient to raise this claim on direct appeal.

Second, as we discussed earlier in this opinion, although the State's pretrial motion and notice of intent to offer prior bad acts evidence identified that the State was seeking to offer the evidence pursuant to both § 27-414 and § 27-404(2), at the hearing, the State focused its argument on the admissibility of Ewinger's prior act of sexual assault under § 27-414. This strategy was clearly the result of the Nebraska Supreme Court's pronouncement in *State v. Kibbee*, 284 Neb. 72, 91, 815 N.W.2d 872, 889 (2012), wherein the court held:

> Although the trial court analyzed the admission of the evidence under § 27-404, we find that the first step in determining whether evidence of prior sexual contacts should be admitted is to review the evidence pursuant to § 27-414. Having conducted such a review, we find no error in the admission of prior acts evidence under § 27-414, and therefore, we do not find it necessary to conduct a separate analysis under § 27-404(2).

As Professor Colin Mangrum noted in his legal treatise:

> Because Rule 414 evidence can be used for general propensity for sexual misconduct, the court in *State v. Kibbee*, found it unnecessary to review for prior error whether evidence properly admitted under Rule 414 also was admissible under Rule 404(2) for a narrower purpose. As a strategy position, if evidence is admissible under 414 for general sexual

- 29 -

propensity, then offering evidence also under 404(2) would narrow, not expand the scope of the relevancy of such evidence. Consequently, in crimes involving prior bad acts of sexual misconduct Rule 404(2) should only be argued as a backup position if the Rule 414 argument fails.

R. Collin Mangrum, Mangrum on Nebraska Evidence 335 (2019).

For those reasons, at the State's request, the district court first set out to determine whether the evidence of the prior sexual assault evidence was admissible under § 27-414. In doing so, as we previously discussed, the court had to undergo the balancing analysis described in § 27-414(3) in order to determine whether the probative value of the evidence was outweighed by any unfair prejudice to Ewinger. In connection therewith, one factor the district court was obligated to weigh was the "similarity of the other acts to the crime charged." Ewinger now argues that in conducting that analysis, counsel was ineffective for not requesting the court to follow the higher "overwhelming similarity" standard under rule 404 rather than the lesser "sufficiently similar" standard in rule 414. This acknowledgement relates to the Nebraska Supreme Court's statement in *State v. Valverde*, 286 Neb. 280, 298, 835 N.W.2d 732, 746 (2013), wherein the court held, "[b]ut in the framework of § 27-414 alone, *Kibbee* should not be read to require overwhelming similarity." Simply stated, the district court would only undergo a § 27-404 analysis if the evidence was not admissible under § 27-414 and we have already held that the evidence was properly admissible under that rule. Accordingly, Ewinger's counsel could not be ineffective for failing to request that the court undergo an analysis that was not required or appropriate under the circumstances and procedural posture of the case. This argument fails.

(m) Failure to Object to Irrelevant Evidence

Ewinger contends that his trial counsel was ineffective in "failing to make a Rule 401 and Rule 403 objection" to the victim's mother's "irrelevant and overly prejudicial testimony" regarding C.A. spending the night and her opinion regarding the appropriateness of C.A.'s sleepovers. Brief for appellant at 30. Ewinger's argument is in reference to Ewinger's first successful objection to C.A.'s unsolicited response that something inappropriate may have taken place during a sleepover at Ewinger's home. In that regard, Ewinger argues that his trial counsel was ineffective for not making Rule 401 and 403 objections to a related isolated comment by the victim's mother that the sleepovers themselves "just didn't seem appropriate."

We first note that evidence of C.A.'s sleepovers was admitted without objection in other parts of this record and Ewinger does not assign error to that evidence. Accordingly, the victim's mother's isolated response that the sleepovers did not seem appropriate has little independent significance in comparison to the overall record which contained evidence of the sleepovers which supported the State's theory that Ewinger groomed C.A. prior to his sexual assault of C.A. at the school. As to the specific alleged failure to make a Rule 401 objection, we find that evidence that C.A. slept over at Ewinger's home was relevant in that it provided factual context to the events leading up to Ewinger's sexual assault of C.A.

We further note that the victim's mother's testimony governing the appropriateness of the sleeping arrangement between C.A. and Ewinger constituted her opinion of the arrangement. Neb. Rev. Stat. § 27-701 (Reissue 2016) provides:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

However, Ewinger has not assigned error in connection with § 27-701 as his assigned assignment relates to failing to object under rules 401 and 403. Accordingly, we do not analyze whether the victim's other's testimony was admissible under lay person opinion testimony.

Finally, unlike C.A.'s testimony about other possible inappropriate activities that may have happened during these sleepovers, which were properly disallowed because these activities were not previously identified and ruled upon under § 27-414, the sleepovers themselves were independently relevant in that they provided factual context to Ewinger's eventual sexual assault of C.A., were previously identified by the State, and were not unfairly prejudicial to Ewinger in this trial. Counsel is not ineffective for failing to make an objection that has no merit. *State v. Tyler*, 301 Neb. 365, 918 N.W.2d 306 (2018). Accordingly, Ewinger's counsel was not ineffective for failing to object and this assignment of error fails.

### (n) Failure to Object to Expert Testimony

Ewinger assigns as error his "[t]rial counsel committed [ineffective assistance of counsel] by failing to object to the expert testimony of Cleaver and Anderson." Brief for appellant at 4. However, in his argument section of his brief on this assigned error, he argues:

Trial counsel committed ineffective assistance of counsel by failing to depose or properly prepare for the cross examination of Cleaver and Anderson. While trial counsel did not anticipate either being called as expert witnesses for the State, he knew that they were going to testify. Defense counsel had an obligation to determine the depth and content of said witnesses' testimony prior to trial. Had counsel been better prepared he could have deposed and cross[-]examined Cleaver on the Hegel report . . . . With respect to Anderson, counsel could have prepared a rebuttal witness, rebuttal material, and alternative theories . . . .

Brief for appellant at 34-35. Appellant's brief is clearly arguing an error which has not been assigned and he does not argue the error which he does assign. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *State v. Jenkins*, 303 Neb. 676, 931 N.W.2d 851 (2019).

### 10. AGGREGATE ERRORS

Finally, Ewinger contends that, due to all of the errors in the aggregate, a new trial is warranted. While any one of several errors may not, in and of itself, constitute prejudicial error warranting a reversal, if all of the errors in the aggregate establish that the defendant did not receive a fair trial, a new trial must be granted. See, *State v. Kern*, 224 Neb. 177, 397 N.W.2d 23 (1986); *State v. McSwine*, 24 Neb. App. 453, 890 N.W.2d 518 (2017). See, also, *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016). The question, then, is whether in the aggregate the claimed errors denied Ewinger a fair trial. See *State v. Kern, supra.*

Having rejected each of Ewinger's assignments of error or found that they were not pled with sufficient particularity, we conclude that he was not denied a fair trial and reject this assignment of error as well.

## VI. CONCLUSION

In sum, having considered each of Ewinger's assignments of error, the majority of Ewinger's claims fail; however, the record on appeal was insufficient for this court to address Ewinger's claims that his trial counsel was ineffective for failing to hire experts to provide testimony to the jury, in failing to investigate and suppress pornographic website evidence, failing to offer medical evidence of Ewinger's erectile dysfunction, and advising Ewinger not to testify. Ewinger's conviction and sentence are affirmed.

AFFIRMED.